[No. A051848. First Dist., Div. Two. Feb. 13, 1992.]

SALLY COLE et al., Plaintiffs and Appellants, v.
CITY OF OAKLAND RESIDENTIAL RENT ARBITRATION BOARD,
Defendant and Respondent;
MONTECITO-STARRBRUCK INVESTORS, Real Parties in Interest.

694

## COUNSEL

Martin Nicolaus for Plaintiffs and Appellants.

Jayne W. Williams, City Attorney, Joyce M. Hicks, Assistant City Attorney, Vincent L. Jones, Assistant to the City Attorney, for Defendant and Respondent.

Bruce C. Reeves for Real Party in Interest.

## OPINION

**SMITH, J.**—Plaintiffs and appellants Sally Cole and four other tenants of residential property in the City of Oakland (City) appeal from a judgment denying their petition for writ of mandate by which the trial court refused to overturn a decision by the Oakland Residential Rent Arbitration Board (Board) approving a 42 percent rent increase for their apartment units.

The City's local rent ordinance allows landlords to impose a rental increase where there is an increase in debt service in order to cover combined expenses and debt service costs. The Board interprets the ordinance to mean that the applicable date for computing rental income is the date that the landlord serves a notice of rent increase on a petitioning tenant. Appellants disagree and claim that the permissible increase should have been computed based on the landlord's "current" income, i.e., after the nonpetitioning tenants have begun paying their rental increases.

We find that the Board's construction is neither unauthorized nor clearly erroneous, and therefore uphold the decision of the trial court denying the requested relief.

### BACKGROUND

#### The Ordinance

Oakland City Council Ordinance No. 9980 (Ordinance) establishes a residential rent arbitration board as part of a comprehensive scheme of

residential rent control. The Board has seven members, consisting of one landlord, one tenant and five neutral members. (Ord., § 4.) The purpose of the Board is to implement the Ordinance's guidelines regarding rent increases and evictions, and to hear appeals from hearing officers' resolutions of landlord-tenant disputes.

Section 5 of the Ordinance generally limits residential rent increases in the City to 6 percent per year. (Ord., § 5, subd. (a).) However, landlords are permitted to justify rent increases in excess of the defined limits on certain enumerated grounds. One of these grounds is increased debt service costs. (Ord., § 5, subd. (c)(5).)

The formula for allowing permissible rent increases based on increased debt service costs is found in the rules and procedures, which the city council passed to assist the Board in implementing the Ordinance. Section 10.4.1 of the Ordinance, Rules and Procedures (section 10.4.1), provides that "An increase in rent based on debt service costs will only be considered in those cases where the total income is insufficient to cover the combined housing service and debt service costs after a rental increase as specified in section 5 of the Ordinance. *The maximum increase allowed under this formula shall be that increase that results in a rental income equal to the total housing service costs plus the allowable debt service costs.*" (Italics added.)

Any tenant dissatisfied with a notice of rent increase may, within 30 days after receipt, file a petition to have the hearing officer determine the extent to which the increase is authorized. (Ord., § 7, subd. (c).) Either the landlord or the tenant may appeal the hearing officer's decision to the Board. (Ord., § 7, subd. (i).)

*Procedural History*

On June 28, 1989 (future calendar dates are to that year unless otherwise indicated), real party in interest Montecito-Starrbruck Investors (the landlord) acquired the apartment building occupied by appellants at 491 Crescent Street. The same day the landlord served notices of rent increases on all tenants of the building. Eleven of the tenants, whose rate increases ranged from 28 to 57 percent, petitioned the Board for a determination of the landlord's permissible rent increase under the Ordinance.

The Board's staff report, which was prepared before the hearing, determined the landlord's gross operating income, that is, income from all rental units (including an assigned rent for vacant units), to be $12,209 per month. The staff then computed the total expenses, including mortgage costs, to be

$17,389.64 per month. This yielded a negative net cash flow of $5,180.64 per month. Applying a formula which took into account the average negative cash flow per unit, the staff concluded that the landlord was entitled to an across-the-board increase of 42 percent for each of the 11 petitioning units.

At the October 3 hearing Mr. Nicolaus, attorney for the petitioners and son of tenant Margot Nicolaus, challenged the staff's use of the prior rent roll for computing the landlord's gross income. Mr. Nicolaus argued that since only 11 tenants petitioned the Board and the remainder had presumably begun paying a higher rent since the landlord acquired the property, the "gross income" figure should include all rents being paid as of the hearing date. On the other hand, Board administrator Lisa Talley-Brown expressed the view that income derived from rent increases since the petitions were filed was irrelevant, and what was important was the rent roll at the time the landlord acquired the property. The hearing was adjourned, with the hearing officer taking the matter under advisement.

On October 3, the hearing officer rendered a decision adopting the staff report in full. The hearing officer found that a 42 percent rent increase on petitioners' units was justified and he made the increases effective November 1.

Six of the petitioners appealed the hearing officer's decision to the full Board on the ground that the landlord's gross income was substantially greater than the $12,209 figure used by the staff report. In May 1990 the Board rejected the appeal and upheld the hearing officer's ruling.

Petitioners then filed a petition for administrative mandamus in superior court, seeking to overturn the decision of the Board. The superior court rendered judgment denying the petition, and petitioners have taken an appeal from that judgment.

APPEAL

The sole issue which we face here is the propriety of the Board's method of computing gross income under section 10.4.1. The Board used the prior owner's rent roll to compute the increases, in accordance with its established and consistent policy of computing permissible rent increases as of the date a petition is filed. Appellants contend that the Board should have instead computed the permissible increase based on "current" income figures, or those which took into account increased rents paid by nonpetitioning tenants since the landlord acquired the building.

Although the interpretation of a statute or ordinance is ultimately a judicial task, "'the contemporaneous construction of a statute by an administrative agency charged with its administration and interpretation, while not

necessarily controlling, is entitled to great weight and should be respected by the courts unless it is clearly erroneous or unauthorized [citations].' " (*Anderson* v. *San Francisco Rent Stabilization & Arbitration Bd.* (1987) 192 Cal.App.3d 1336, 1343 [237 Cal.Rptr. 894], quoting *City of Santa Ana* v. *City of Garden Grove* (1979) 100 Cal.App.3d 521, 530 [160 Cal.Rptr. 907]; accord *Wilkinson* v. *Workers' Comp. Appeals Bd.* (1977) 19 Cal.3d 491, 501 [138 Cal.Rptr. 696, 564 P.2d 848].) This principle is especially applicable where, as here, the Board's interpretation is longstanding and has remained uniform. (*Engs Motor Truck Co.* v. *State Bd. of Equalization* (1987) 189 Cal.App.3d 1458, 1471 [235 Cal.Rptr. 117].)

We must therefore defer to the Board's interpretation of section 10.4.1 unless we find such construction to be arbitrary, capricious or without a reasonable or rational basis. (*General American Transportation Corp.* v. *State Bd. of Equalization* (1987) 193 Cal.App.3d 1175, 1182 [238 Cal.Rptr. 865]; *Culligan Water Conditioning* v. *State Bd. of Equalization* (1976) 17 Cal.3d 86, 93, fn. 4 [130 Cal.Rptr. 321, 550 P.2d 593].)

■ Section 10.4.1 allows a landlord incurring increased debt service costs to pass on these costs to the tenants in the form of a rent increase. However, an increase is not permitted unless the landlord's total income is insufficient to cover these expenses, and the maximum increase permitted is that which equals total housing expenses plus debt service costs. The purpose of the provision, as stated by the Board, is to allow a landlord experiencing a negative cash flow due to higher mortgage payments to raise rents by an amount sufficient to reach the "break even" point.[1]

The present dispute would not have come about if all the tenants who received rent increase notices had filed petitions. Here, however, only 11 tenants in the 27-unit building did so.[2] The remaining tenants either paid the increase demanded, moved out, or negotiated a new deal with the landlord for a rent lower than that proposed. In any event, it is conceded that the rent collected by the landlord since its acquisition of 491 Crescent Street has gone up due to increased rent paid by nonpetitioning tenants.

Nevertheless, the Board was faced with the task of determining when to fix the date on which gross income would be computed. It decided to use the date on which the petition was filed, rather than some later point in time. For

[1]In theory, at least, the Ordinance does not even permit the landlord to achieve a zero deficit posture, since not more than 95 percent of eligible debt service can be passed on to the tenants. (Ord., Rules and Procedures, § 10.4.2.)

[2]That number dwindled to six by the time of the appeal to the Board and presently stands at five.

the reasons which follow, we do not view this choice as unreasonable or arbitrary.

A primary ground for using the date of the petition in figuring income is consistency. The sending out of rent increase notices does not fix the landlord's income. Some tenants will petition the Board, some may, as was the case here, renegotiate their rent with the landlord, others will move out and new tenants will move in. Rent control ordinances typically use a past date as a starting point for computing maximum allowable rents, in order to offset last-minute artificial fluctuations in market conditions. (*Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 165 [130 Cal.Rptr. 465 [550 P.2d 1001].) The Board's decision to employ such a procedure, while assigning rental values to vacant units, was a fair and reasonable solution to the problem.

Acceptance of the idea that "current" income figures must be used would pose a host of practical problems. Would the Board be obligated to use income figures in effect as of the date of the hearing, the date of an appeal to the Board, the date a court of law determines a petition for administrative mandate or even the date an appeal in this court is decided? Because the landlord's cash flow is continually subject to change, the potential for arbitrary and anomalous results is great. The Board's practice of using the rental income the landlord is receiving (or should be receiving if all units are rented) as of the date of the event precipitating the need for a rent increase, avoids these problems.

Focusing on income figures at a point in time later than when the increased debt service occurs would also likely lead to a situation where nonpetitioning tenants in effect subsidize petitioning tenants. For example, if a landlord raises the rent of all tenants 200 percent when a 100 percent increase would be sufficient to restore an even cash balance and just half the tenants start paying the increase, under appellants' reasoning the remaining half would not have to pay any increase at all. This would lead to grossly unequal distribution of the debt service cost among tenants of the same building, instigate a "petition-or-else" attitude among tenants, and strongly discourage landlords and tenants from resolving rent disputes amicably and without the need for administrative intervention.

Appellants' chief complaint is that using the rent roll as of the date of the increased debt service allows the landlord to reap a "windfall," since any increased revenues coming in from nonpetitioning units are exempt from the Board's calculation and may be kept as profit.

It must be kept in mind, however, that permissible increases under section 10.4.1 are allowed only to enable the landlord to avoid operating at a deficit. ■ In order to be constitutionally valid, rent control legislation must permit landlords to earn a " 'just and reasonable' " rate of return on their investment (*Vega* v. *City of West Hollywood* (1990) 223 Cal.App.3d 1342, 1348 [273 Cal.Rptr. 243]; *Birkenfeld* v. *City of Berkeley, supra*, 17 Cal.3d at p. 165), i.e., one high enough to encourage good management, reward efficiency, discourage the flight of capital, and enable operators to maintain their credit. (*San Marcos Mobilehome Park Owners' Assn.* v. *City of San Marcos* (1987) 192 Cal.App.3d 1492, 1502 [238 Cal.Rptr.290].) ■ The fact that permissible rent increases as to petitioning tenants coupled with increased rent payments from nonpetitioning tenants may ultimately result in a landlord realizing a net return rather than a negative cash flow does not render the Board's construction of section 10.4.1 unreasonable.

Moreover, the tenants themselves have the power to limit whatever "windfall" the landlord may potentially reap by filing petitions with the Board. As indicated earlier, the greater the number of petitioning tenants the less effect unregulated increased rent payments will have on the Board's computations. And the more outrageous the increase the more incentive the tenants will have to petition.

■ Our courts have ruled time and again that rent control agencies are not obliged to fix rents by application of any particular method or formula. (*Kavanau* v. *Santa Monica Rent Control Bd.* (1991) 233 Cal.App.3d 1095, 1104 [284 Cal.Rptr. 889]; *Carson Mobilehome Park Owners' Assn.* v. *City of Carson* (1983) 35 Cal.3d 184, 191 [197 Cal.Rptr. 284 [672 P.2d 1297].) As in other methods of rent calculations, "a court 'may compel [an] agency to act, but it may not substitute its discretion for the discretion properly vested in the administrative agency . . . "Courts should let administrative boards and officers work out their problems with as little judicial interference as possible . . . ." ' " (*Vega* v. *City of West Hollywood, supra*, 223 Cal.App.3d 1342, 1352, quoting *Lindell Co.* v. *Board of Permit Appeals* (1943) 23 Cal.2d 303, 315 [144 P.2d 4].)

■ The method of computing gross income used by the Board is neither unreasonable nor clearly erroneous. No abuse of discretion or act in excess of jurisdiction has been shown. The writ was properly denied. (Code Civ. Proc., § 1094.5, subd. (b).)

Appellants also argue they were entitled to attorney's fees under Government Code section 800 based on a pattern of "arbitrary or capricious" conduct by a government agency. For obvious reasons, we reject this claim.

## DISPOSITION

Judgment affirmed.

Kline, P. J., and Peterson, J., concurred.

A petition for a rehearing was denied March 9, 1992.