[No. B073052. Second Dist., Div. One. Oct. 21, 1993.]

EARL W. KAVANAU, Plaintiff and Appellant, v.
SANTA MONICA RENT CONTROL BOARD, Defendant and
Respondent.

**COUNSEL**

Earl W. Kavanau, in pro. per., for Plaintiff and Appellant.

Trevor Grimm and Craig Mordoh as Amici Curiae on behalf of Plaintiff and Appellant.

Gilbert H. Friedman, Anthony A. Trendacosta and Ralph H. Goldsen for Defendant and Respondent.

## OPINION

**VOGEL (Miriam A.), J.**—The issue in this case is whether the City of Santa Monica Rent Control Board's absolute limitation on annual rental increases is constitutional as applied. Our answer is that it is not.

### FACTS

#### A.

In 1979, the City of Santa Monica adopted a rent control charter amendment and created an elected Rent Control Board "empowered to regulate rentals . . . so that rents will not be increased unreasonably and so that landlords will receive no more than a fair return." Pursuant to the charter amendment, the Board adopted Regulations 4100 through 4111, a "maintenance of net operating income" (MNOI) formula to determine whether a landlord is receiving a fair return and, if not, the basis on which rents can be increased.[1] The MNOI, in turn, is limited by Regulation 4107.

Under Regulation 4107(a), regardless of the amount of rent needed to satisfy the MNOI formula, and notwithstanding any other provision of the regulations, "[n]o upward rent adjustment may be authorized for any 12 month period in an amount in excess of twelve percent (12%) or twice the Employment Cost Index (ECI), whichever is greater." (We refer to this as a 12 percent cap.) If the amount of any adjustment otherwise authorized by the MNOI formula exceeds 12 percent, "the full justified amount shall be granted over a period of years such that the rent does not increase by greater than the said limit in any given year." Simply put, under Regulation 4107(a), rents can never be increased more than 12 percent (or twice the ECI) in any year, notwithstanding the amount of entitlement under the MNOI.

#### B.

In 1988, Earl W. Kavanau purchased a 10-unit apartment building in Santa Monica which was badly in need of repair. Between November 1,

---

[1]Under the MNOI formula (which is a return on investment standard), the landlord's 1978 earnings are presumptively a "fair return" and the regulation is designed to maintain this fair return in subsequent years by allowing rents to be raised based on increased operating expenses and inflation. (See *Baker* v. *City of Santa Monica* (1986) 181 Cal.App.3d 972, 976, fn. 4 [226 Cal.Rptr. 755]; see also *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 679-680 [209 Cal.Rptr. 682, 693 P.2d 261].) Rent control agencies are not constitutionally obliged to fix rents by any particular method but they are required to administer the selected formula in a manner which avoids confiscatory results. (*Fisher* v. *City of Berkeley, supra*, 37 Cal.3d at pp. 680-681; see also *Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805, 816 [258 Cal.Rptr. 161, 771 P.2d 1247] [the state and federal constitutions are concerned not so much with the way in which rates are set as with the result reached in the application of those rates].)

1988, and October 31, 1989, Kavanau spent $98,099 on the building ($33,565 on operating expenses such as taxes, utilities and maintenance, plus $64,534 on capital improvements).[2] For the same period, his annualized debt service (which is excluded from the MNOI calculation) was $44,000. (Reg. 4101(c)(2)(ii) [mortgage principal and interest payments shall not be considered as an operating expense]; compare *Cotati Alliance for Better Housing* v. *City of Cotati* (1983) 148 Cal.App.3d 280, 294 [195 Cal.Rptr. 825] [to be fair and reasonable, the allowed amount of rent should permit the property to generate income sufficient to cover the costs of operation and *the servicing of reasonable financing* and should ensure the return of a reasonable profit].) His annualized rental income for that period was $43,444.[3]

In November 1989, Kavanau applied to the Board for permission to raise rents, seeking an average increase of about $474 per month for nine of the ten units. In April 1990, the Board's hearing examiner determined that Kavanau was entitled, under the MNOI, to permanent increases of $183 per month per unit, plus an additional $140 per month per unit for the duration of the useful life of the capital improvements, a total of $323 per month per unit, starting immediately. (These figures are approximate, as they vary from unit to unit and, for the sake of simplicity, we use the rough figure of $35,000 to refer to the increased rent Kavanau would receive for the year in question if he had the benefit of the hearing examiner's findings under the MNOI.) To state the obvious, the hearing examiner's findings necessarily included the determination that, without the allowed increase, Kavanau was not making a fair return on his investment.

By applying the 12 percent cap, however, the hearing examiner reduced Kavanau's first year rent increase from $35,000 to $5,184, with the balance of the $35,000 to be implemented over eight years of annualized increases, each not to exceed the 12 percent cap.[4] Although Kavanau offered evidence to show why, in his view, the 12 percent cap ought not to be applied to him,

---

[2]Kavanau actually spent an additional $18,400 on capital improvements during the same period but the Board's hearing examiner determined those expenditures were "unnecessary" to maintain the property and could not be used to calculate the allowable rent increase. This finding is not contested.

[3]We are not asked on this appeal to decide whether the MNOI properly excludes from consideration a landlord's debt service. We note, however, that we can't accept the Board's overly broad assertion that this expense is properly excluded "because payments towards debt service build equity and therefore benefit the owner." "Debt service" includes interest, not just principal and, at a minimum, debt service is a factor which appears relevant to the determination whether, in fact, a landlord is receiving a fair return.

[4]What this means is that Kavanau was denied the current use of the money the hearing examiner determined he was entitled to receive, and that he has permanently lost whatever interest or other income he could have earned with that money. It also means that any other increases which would automatically be justified over the next eight years (see, e.g., Reg.

the hearing examiner ruled all such evidence irrelevant and inadmissible. On April 7, 1990, the hearing examiner issued his decision, with findings that Kavanau was entitled to a $35,000 increase under the MNOI formula. Kavanau's rental increases were nevertheless limited by the 12 percent cap, to a total of $5,184.

Kavanau appealed to the Board, without success, and he then petitioned the trial court for a writ of administrative mandate to overturn the Board's decision. While the matter was pending in the trial court, the Board added a new subdivision (f) to Regulation 4107, to authorize a waiver of the 12 percent cap "in extraordinary circumstances." Later, Kavanau's petition was denied and he appeals from the judgment thereafter entered.[5]

## DISCUSSION

Kavanau contends Regulation 4107(a) is facially unconstitutional or, alternatively, unconstitutional as applied to his situation. For the following reasons, we agree that the regulation is unconstitutional as applied.

### A.

First, we summarily reject the Board's rather disingenuous assertion that the constitutionality of Regulation 4107(a) was determined in *Baker* v. *City of Santa Monica*, *supra*, 181 Cal.App.3d at page 988. *Baker* holds only that net operating income standards (such as Santa Monica's) have been approved by our courts. Regulation 4107 is not discussed (it is not even mentioned).

### B.

Second, we recite the basic requirements of a valid rent control scheme: Although no particular formula is required, the rules adopted must be reasonably calculated to eliminate excessive rents while at the same time providing "landlords with a just and reasonable return on their property."

1805(b) [which grants an automatic general adjustment pursuant to a specified formula]) will be disallowed or at least indefinitely delayed because Kavanau will have already reached the 12 percent cap. (*Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 169 [130 Cal.Rptr. 465, 550 P.2d 1001] [" 'Property may be as effectively taken by long-continued and unreasonable delay in putting an end to confiscatory rates as by an express affirmance of them' "]; *Cromwell Assocs.* v. *Newark* (1985) 211 N.J.Super. 462 [511 A.2d 1273, 1276] [where there is no provision to factor in an increase lost because of a cap on rental increases, the cap "would cause a snowball effect of losses that might not be recouped"].)

[5] As will appear, our review of Regulation 4107 is based on the current version, including subdivision (f). (Cf. *Kash Enterprises, Inc.* v. *City of Los Angeles* (1977) 19 Cal.3d 294, 306, fn. 6 [138 Cal.Rptr. 53, 562 P.2d 1302].)

(*Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d at p. 165; *Fisher* v. *City of Berkeley, supra,* 37 Cal.3d at pp. 680-681.) The formula cannot be confiscatory (*Calfarm Ins. Co.* v. *Deukmejian, supra,* 48 Cal.3d at pp. 816-821) and it cannot impose an absolute limit on rental increases (*id.* at p. 817; *City of Miami Beach* v. *Forte Towers, Inc.* (Fla. 1974) 305 So.2d 764; *Cromwell Assocs.* v. *Newark, supra,* 511 A.2d at p. 1275 [any absolute limit, "even a generous 25%," is arbitrary in that it may not insure a fair return in all circumstances].)

## C.

Third, we turn to Regulation 4107(f) (the Board's new authority to waive the 12 percent cap "in extraordinary circumstances") which, on its face, would appear to save the 12 percent cap from Kavanau's constitutional attack. Obviously, the 12 percent cap would not be an "absolute" limit if it could be waived when required to permit a landlord a fair, just and reasonable return on his investment.

But that is not what the Board has in mind. At oral argument, we asked counsel for the Board to identify the type of circumstance which might be considered "extraordinary" within the meaning of Regulation 4107(f). Quite frankly, the answer we got was not the one we expected—as the Board intends to apply Regulation 4107(f), a landlord whose building is substantially destroyed by an earthquake and who has difficulty obtaining financing to rebuild it would "probably" be eligible for relief from the 12 percent cap. But a landlord in the position of Earl Kavanau would not. In short, to the City of Santa Monica's Rent Control Board, "extraordinary" means insolvency or an act of God is threatened or has actually arrived and it does not include the mere loss of a fair and reasonable return. (Cf. *Calfarm Ins. Co.* v. *Deukmejian, supra,* 48 Cal.3d at p. 818.)[6]

## D.

With the addition of subdivision (f)'s "extraordinary circumstances" waiver of the 12 percent cap, Regulation 4107(a) is *not* unconstitutional *on*

---

[6]The Board's interpretation of Regulation 4107(f) makes it unnecessary for us to determine whether any evidence Kavanau might have presented on his appeal to the Board could or should reasonably have been considered in deciding whether to waive the 12 percent cap. His building was not damaged by an earthquake. He just wanted to show that he would not be receiving a fair return on his investment if the amount the Board determined to be a fair return was reduced as required by the 12 percent cap. (See *Fox* v. *San Francisco Residential Rent etc. Bd.* (1985) 169 Cal.App.3d 651, 657 [215 Cal.Rptr. 565] [approving a cap on yearly increases because the regulation at issue permitted exceptions for "extraordinary circumstances" and empowered the hearing officer to consider all "relevant factors" in determining whether a rent increase in excess of the cap was justified].)

*its face.* (*Fisher* v. *City of Berkeley, supra,* 37 Cal.3d at p. 679 [a regulation will be declared invalid on its face only when its terms do not permit those who administer it to avoid confiscatory results in its application].) But with the Board's interpretation of subdivision (f), section 4107(a) *is* unconstitutional *as applied* in this case. (37 Cal.3d at p. 682 [a fair return on investment standard is constitutional as applied only if the regulation affords the Board sufficient flexibility to avoid confiscatory results]; *Calfarm Ins. Co.* v. *Deukmejian, supra,* 48 Cal.3d at p. 816 [we focus less on the rate specified in the regulation than on the ability of the person affected to obtain relief if that rate proves confiscatory].)[7]

E.

■ As was said in *Cotati Alliance for Better Housing* v. *City of Cotati, supra,* 148 Cal.App.3d at page 296, ". . . the purpose of rent control is not to make the landlord a private guarantor of affordable housing for tenants, nor is it to bring about such a degree of decreased maintenance and services as to diminish the quality of housing available. The purpose of rent control is to permit an efficient landlord to pay all actual and reasonable expenses and receive a fair profit while, at the same time, protecting the public interest in having affordable and properly maintained rental housing available to the citizens of the community." **(1c)** As applied, the City of Santa Monica's 12 percent cap does not meet these goals. Accordingly, we hold that Kavanau is entitled to the result which follows from the validly applied MNOI formula, without the 12 percent cap.[8]

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court with directions to enter a new judgment in favor of Kavanau and to issue a writ of mandate commanding the Board to permit Kavanau to implement the balance remaining of the increases determined by the hearing examiner to be

---

[7]It is not and could not be disputed that Kavanau could not obtain a fair return under the Board's approach. To the contrary, his deficit for the year in question would be $111,871— $98,099 of allowed operating expenses and capital improvements, plus $18,400 of expenses Kavanau incurred but the Board determined were "unnecessary," plus $44,000 in debt service, less $43,444 in existing rents, less the allowed increase of $5,184, equals $111,871. (See *Cotati Alliance for Better Housing* v. *City of Cotati, supra,* 148 Cal.App.3d at p. 293 [inherent in the due process standard of "a just and reasonable return" is the assurance that an efficient landlord may recover all reasonable expenses actually incurred and, in addition, receive a fair profit or return on investment].) And while it is true that a deficit, standing alone, is not determinative of whether a landlord is earning a just and reasonable return, a deficit of this magnitude does not leave a lot of room for debate.

[8]We do not express a view about what might happen if, in future cases, the Board broadens its interpretation of "extraordinary circumstances" under Regulation 4107(f).

appropriate under the MNOI, without any reduction under Regulation 4107(a). If questions arise concerning implementation of this opinion, they shall be resolved by the trial court following appropriate hearings. Kavanau is awarded his costs of appeal.

Spencer, P. J., and Masterson, J., concurred.

A petition for a rehearing was denied November 9, 1993, and respondent's petition for review by the Supreme Court was denied February 3, 1994. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.