[No. B099368. Second Dist., Div. Six. July 29, 1996.]

JOSEPH DONOHUE et al., Plaintiffs and Appellants, v.
SANTA PAULA WEST MOBILE HOME PARK et al., Defendants and
Respondents.

## COUNSEL

Richard A. Weinstock for Plaintiffs and Appellants.

Allen, Matkins, Leck, Gamble & Mallory, Thomas E. Gibbs, Michael V. Rovere, Collins, Collins, Muir & Traver, Samuel J. Muir and Robert H. Stellwagen, Jr., for Defendants and Respondents.

## OPINION

**YEGAN, J.**—Government Code section 66427.5 requires the subdivider of a mobilehome park converted to resident ownership to avoid the "economic displacement" of "nonpurchasing residents" by, among other things, limiting the time period over which space rents "may increase from the preconversion rent to market levels . . . ." (Gov. Code, § 66427.5, subd. (d)(1).)[1] The City of Santa Paula (City) has adopted, by initiative, a mobilehome space rent stabilization ordinance (Santa Paula Mun. Code, ch. 8.48), that allows smaller rent increases over the same period of time (the initiative).[2]

This case involves a failed attempt by residents to convert the Santa Paula West Mobile Home Park (the Park) to resident ownership and the Park owner's subsequent attempt to increase rents to the level allowed under section 66427.5. The question is whether section 66427.5 applies where, as here, the conversion to resident ownership does not occur. If the statute applies, we must determine whether it preempts the initiative. If the initiative applies, we must determine whether it denies a fair return on investment to park owners and is, therefore, facially unconstitutional.

Following a court trial on stipulated facts, the trial court found that section 66427.5 applies whenever a subdivider files a tentative map to convert a rental park to resident ownership, even if the conversion does not occur. Thus, the trial court found that section 66427.5 regulates rents at the Park and preempts contrary provisions in the initiative. Accordingly, it entered judgment in favor of respondents the City, the Park, and the Park's owners and managers, Santa Paula West, Ltd., James Taylor, and American Capital Property Management, Inc. (collectively, SPW).

After conducting the necessary independent review (*City of Los Angeles v. Los Olivos Mobile Home Park* (1989) 213 Cal.App.3d 1427, 1431 [262

---

[1]All statutory references are to the Government Code unless otherwise stated.
[2]All further references to the initiative are to chapter 8.48 of the City of Santa Paula Municipal Code.

Cal.Rptr. 446]), we conclude that section 66427.5 applies only after a rental park is converted to resident ownership. Since the conversion never occurred here, section 66427.5 does not apply. It is unnecessary for us to determine whether, following a successful conversion, it would preempt the initiative. Finally, we conclude that the initiative is not facially invalid. We therefore reverse.

*Facts*

In 1991, residents attempted to convert the Park from a rental park to resident ownership. To facilitate the conversion, SPW, who had previously held only a ground lease, purchased the land. Pro-conversion residents filed a tentative subdivision map with the City in June 1992 that was approved in October 1992. Residents were unable, however, to obtain the necessary financing and the Park has never been converted to resident ownership.

In November 1992, City voters adopted the initiative to stabilize rents at mobilehome parks. In June 1994, SPW notified Park residents that it was increasing the rent by approximately 12 percent. Both SPW and the City took the position that rents at the Park were controlled by section 66427.5 rather than the initiative because a tentative map to convert the Park had been filed.

Appellants, the Park residents, sought a declaratory judgment that section 66427.5 did not apply and that the proposed rent increase violated the initiative. Appellants also sought to enjoin the rent increase and to recover damages for SPW's "willful" violation of the initiative. SPW cross-complained for a declaration that the initiative was preempted by section 66427.5 or, alternatively, that SPW was entitled to a "fair return" rent increase under the initiative. SPW also argued that the initiative was facially unconstitutional because it denied park owners a fair return on their investment by failing to account for land acquisition costs.

*Appellants' Claims Are Not Time-barred.*

At the outset, we reject the City's argument that appellants' claims are barred under section 66499.37 because they failed to challenge the tentative map within 90 days after its approval.[3] Appellants do not allege that the City violated the Subdivision Map Act or improperly approved the tentative map. In fact, the question whether the City properly approved the

---

[3]Section 66499.37 provides in part: "Any action or proceeding to attack, review, set aside, void or annul the decision of a[] . . . legislative body concerning a subdivision, . . . shall

tentative map is irrelevant to appellants' claim that the initiative, not section 66427.5, governs rent at the Park. Accordingly, section 66499.37 does not bar appellants' claims. (*Lacher* v. *Superior Court* (1991) 230 Cal.App.3d 1038, 1050-1051 [281 Cal.Rptr. 640].)

### Section 66427.5 Does Not Apply Where the Attempt to Convert to Resident Ownership Fails.

Section 66427.5 provides: "At the time of filing a tentative or parcel map for a subdivision to be created from the conversion of a rental mobilehome park to resident ownership, the subdivider shall avoid the economic displacement of all nonpurchasing residents . . ." by offering each existing tenant the option to either purchase the condominium unit, "which is to be created by the conversion of the park . . . or to continue residency as a tenant." (§ 66427.5, subd. (a).) The subdivider must also file and distribute to each park resident a report on the impact of the conversion. (*Id.*, subds. (b), (c).)[4]

Before local government acts on the tentative map, it may require the subdivider to attend a hearing to determine whether the conversion complies with section 66427.5. Local government must also require the subdivider "to avoid the economic displacement of all nonpurchasing residents in accordance with the following: [¶] (1) As to nonpurchasing residents who are not lower income households, . . . the monthly rent, including any applicable fees . . . for use of any preconversion amenities, may increase from the preconversion rent to market levels . . . in equal annual increases over a four-year period." (§ 66427.5, subd. (d)(1).) For lower income nonpurchasing residents, the statute allows smaller annual increases "from the preconversion rent," based upon previous rent increases and the consumer price index. (§ 66427.5, subd. (d)(2).)

Respondents argue, and the trial court found, that the rent increase provisions in section 66427.5, subdivision (d), apply as soon as anyone files a tentative map, even if the conversion never occurs. We must, respectfully, disagree. Those provisions rationally apply only after conversion to resident ownership.

In construing section 66427.5, our first task is to ascertain the intent of the Legislature to ensure that we effectuate the purpose of the law.

---

not be maintained by any person unless such action or proceeding is commenced . . . within 90 days after the date of such decision."

[4]Shortly before the trial court entered judgment, section 66427.5 and a companion statute, section 66427.4, were amended. The parties have analyzed the 1994 versions of these statutes at great length. Our opinion, however, focuses on the current statute. In any event, we would reach the same result under the prior statute.

(*Looney* v. *Superior Court* (1993) 16 Cal.App.4th 521, 531 [20 Cal.Rptr.2d 182].) If possible, that intent must be ascertained from the language of the statute. (*Unzueta* v. *Ocean View School Dist.* (1992) 6 Cal.App.4th 1689, 1697 [8 Cal.Rptr.2d 614].) We construe the language "in the context of the statutory framework as a whole, keeping in mind the policies and purposes of the statute [citation], and where possible the language [is] read so as to conform to the spirit of the enactment. [Citation.]" (*Rudd* v. *California Casualty Gen. Ins. Co.* (1990) 219 Cal.App.3d 948, 952 [268 Cal.Rptr. 624].)

In its opening sentence, section 66427.5 states that its purpose is to "avoid the economic displacement of all nonpurchasing residents" in rental parks that are converted to resident ownership. Under respondents' theory, section 66427.5 applies as soon as a subdivider files a tentative map to convert to resident ownership, regardless of whether conversion actually occurs. We do not impugn the integrity of SPW. However, if respondents are correct, every park owner could purchase a lifetime exemption from local rent control for the cost of filing a tentative map, even if park residents have no ability to purchase and even if local government disapproves the tentative map. Park residents could then be economically displaced by unregulated rent increases. This is the very circumstance section 66427.5 was enacted to prevent. We cannot adopt an interpretation that directly contradicts the Legislature's intent. (*Looney* v. *Superior Court, supra,* 16 Cal.App.4th at p. 531; *Rudd* v. *California Casualty Gen. Ins. Co., supra,* 219 Cal.App.3d at p. 952.)

We are required to give effect to every portion of section 66427.5, to avoid an interpretation which would render terms surplusage, and to give every word " 'some significance, leaving no part useless or devoid of meaning.' " (*Los Angeles County Safety Police Assn.* v. *County of Los Angeles* (1987) 192 Cal.App.3d 1378, 1390 [237 Cal.Rptr. 920], quoting *City and County of San Francisco* v. *Farrell* (1982) 32 Cal.3d 47, 54 [184 Cal.Rptr. 713, 648 P.2d 935].) Respondents' interpretation would have precisely the opposite effect and must, therefore, be rejected.

For example, the rent-increase provisions apply to "nonpurchasing residents." (§ 66427.5, subd. (d)(1), (2).) That term, however, only has meaning when applied to a park in which some residents have purchased their spaces and others have not. If the park is never converted, every resident is a "nonpurchasing resident" and the term "nonpurchasing" pales to irrelevancy.

Respondents' interpretation also renders meaningless the terms of section 66427.5, subdivision (d)(1) and (2), which provide that monthly rent may

"increase from the preconversion rent[.]" (§ 66427.5, subd. (d)(1), (2).) By definition, the term "preconversion" distinguishes between the rent charged before conversion and the rent charged after conversion. Had the Legislature intended to distinguish between the rent charged before a tentative map is filed and the rent charged after filing, it easily could have done so.

Moreover, respondents entirely ignore the opening portion of section 66427.5, subdivision (d). Under that subdivision, the responsible local agency must require the subdivider to comply with all portions of the statute and may hold a hearing to determine compliance. This local oversight would be futile if the subdivider could increase rents regardless of whether local government approved the map. Having secured a lifetime exemption from rent control, the subdivider could disregard the demands of local government, ignore its statutory obligations, abandon the conversion and increase space rents as much as it desired. Not only would this result violate the purpose of section 66427.5, it would effectively repeal the first two sentences of subdivision (d).

Respondents argue that section 66427.5 applies before conversion because the statute begins with the phrase, "[a]t the time of filing a tentative or parcel map[.]" Read in isolation, respondents would be correct. Read in context, however, this phrase does not describe when the rent increase provisions take effect. Instead, it describes when the subdivider must offer tenants the option to purchase their space, file and distribute the tenant impact report, and demonstrate to local government that the conversion plan complies with the statute. The rent increase provisions in subdivision (d)(1) and (2) provide the standard to be used by local government in deciding whether the conversion plan adequately protects nonpurchasing residents from economic displacement as required by the statute. Thus, the opening phrase of section 66427.5 describes when the subdivider must inform local government of the rent increases it expects to enact after conversion, not the date on which the increases take effect. The presence of this phrase at the beginning of the section does not mandate that we construe the statute to defeat the Legislature's purpose or to render meaningless its remaining provisions.

*The Initiative Is Not Facially Unconstitutional.*

SPW raises only a facial challenge to the initiative. It does not claim that the initiative has been applied in a manner that denies SPW a fair return on its investment. As a result, the record contains no evidence concerning the City's willingness to grant SPW a rent increase, the rents it would allow SPW to charge, the costs SPW incurs in connection with the Park, or the return SPW receives on its investment.

Our inquiry is, therefore, limited in scope. ■ "[W]hether rental regulations are fair or confiscatory depends ultimately on the result reached. [Citation.] That determination, of course, can only be made by analyzing a challenge to the regulation as applied. Nevertheless, we will declare a regulation invalid on its face 'when its terms will not permit those who administer it to avoid confiscatory results in its application to the complaining parties.' [(*Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 165 [130 Cal.Rptr. 465, 550 P.2d 1001]).] [Citations.]" (*Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 679 [209 Cal.Rptr. 682, 693 P.2d 261].)

■ Constitutionally valid rent control schemes must allow park owners to earn a "just and reasonable" or "fair" return on their investment. (*Apartment Assn. of Greater Los Angeles* v. *Santa Monica Rent Control Bd.* (1994) 24 Cal.App.4th 1730, 1737 [30 Cal.Rptr.2d 228]; *Cole* v. *City of Oakland Residential Rent Arbitration Bd.* (1992) 3 Cal.App.4th 693, 700 [4 Cal.Rptr.2d 593].) The term "fair return" is incapable of precise definition (*City of Berkeley* v. *City of Berkeley Rent Stabilization Bd.* (1994) 27 Cal.App.4th 951, 984 [33 Cal.Rptr.2d 317]), but is generally considered to include returns that are "commensurate with returns on investments in other enterprises having comparable risks" (*Fisher* v. *City of Berkeley*, *supra*, 37 Cal.3d at p. 683), or "high enough to encourage good management, reward efficiency, discourage the flight of capital, and enable operators to maintain their credit." (*Cole* v. *City of Oakland Residential Rent Arbitration Bd.*, *supra*, 3 Cal.App.4th at p. 700.)

While the state and federal Constitutions mandate that landlords receive a "fair return," they do not require local governments to adopt any particular method for determining the rents that may be charged. (*Carson Mobilehome Park Owners' Assn.* v. *City of Carson* (1983) 35 Cal.3d 184, 191 [197 Cal.Rptr. 284, 672 P.2d 1297]; *Kavanau* v. *Santa Monica Rent Control Bd.* (1993) 19 Cal.App.4th 730, 732 [23 Cal.Rptr.2d 724]; *Cole* v. *City of Oakland Residential Rent Arbitration Bd.*, *supra*, 3 Cal.App.4th at p. 700.) Instead, courts have consistently affirmed that "selection of an administrative standard by which to set rent ceilings is a task for local governments —in this case the voters themselves—and not the courts." (*Fisher* v. *City of Berkeley*, *supra*, 37 Cal.3d at p. 681.)

■ The initiative uses a "maintenance of net operating income" approach to determine whether a park owner has achieved a fair return or is entitled to a rent adjustment. It sets the base rent at the rent in effect on December 31, 1991, and allows annual adjustments for increases in the consumer price index. (§ 8.48.040, subd. (A).) Rents may also be adjusted

for capital improvements. (§ 8.48.070, subd. (B).) Section 8.48.080 allows a park owner to apply to the Mobilehome Rent Review Commission (Commission) for an additional rent increase "on the ground that it is required to permit a just and reasonable return and maintain net operating income ('NOI') . . . ." (*Ibid.*) The definition of net operating income excludes from consideration, "[m]ortgage principal, interest payments, and payments by the owner under any ground lease." (§ 8.48.080, subd. (C)(2).)

The Commission may permit a rent adjustment to "increase the park's current NOI by seventy-five percent of the increase in CPI since 1984 which shall be the base year." (§ 8.48.080, subd. (D).) "Special base year operating adjustments[,]" are also available if the Commission determines "that the base year net operating income yielded other than a fair return . . . ." (§ 8.48.080, subd. (E)(1)(c).) Such an adjustment may be allowed if "[t]he owner's operating and maintenance expenses in the base year were unusually high or low in comparison to other years . . . ," or "[t]he gross income during the base year was significantly lower than normal because of destruction of the premises and/or temporary eviction [for] construction or repairs, or other special circumstances." (*Id*, subd. (E)(1)(c)(i) & (ii).)

SPW contends that the initiative is unconstitutional because it does not consider land acquisition costs in determining net operating income. Numerous courts, however, have acknowledged that the maintenance of net operating income approach is constitutionally valid, even where an ordinance ignores certain expenses incurred by landlords. (*City of Berkeley* v. *City of Berkeley Rent Stabilization Bd.*, *supra*, 27 Cal.App.4th at p. 974; *Apartment Assn. of Greater Los Angeles* v. *Santa Monica Rent Control Bd.*, *supra*, 24 Cal.App.4th at p. 1738; *Palos Verdes Shores Mobile Estates, Ltd.* v. *City of Los Angeles* (1983) 142 Cal.App.3d 362, 371-372 [190 Cal.Rptr. 866].) In fact, the approach "has been praised by commentators for both its fairness and ease of administration." (*Palomar Mobilehome Park Assn.* v. *Mobile Home Rent Review Com.* (1993) 16 Cal.App.4th 481, 486 [20 Cal.Rptr.2d 371].)[5]

Moreover, because this case presents only a facial challenge to the initiative, there is no evidence that the exclusion of land acquisition costs

---

[5]SPW argues that it is constitutionally entitled to consideration of land acquisition costs under *Palomar Mobilehome Park Assn.* v. *Mobile Home Rent Review Com.*, *supra*, 16 Cal.App.4th 481 (*Palomar*), and *Westwinds Mobile Home Park* v. *Mobilehome Park Rental Review Bd.* (1994) 30 Cal.App.4th 84 [35 Cal.Rptr.2d 315]. The argument misconstrues both cases. Neither held that a rent control scheme is facially unconstitutional unless it accounts for land acquisition costs. In fact, neither case involved a facial challenge to a rent control ordinance that used the net operating income approach. Moreover, neither case found a constitutional objection to the approach. To the contrary, *Palomar* praised it, but found it inapplicable because the ordinance at issue did not establish a base year for comparison

will, by definition, deprive park owners of a fair return. There is no basis for concluding that the returns allowed under the initiative are so near the constitutional minimum that the failure to consider one cost will inevitably push SPW, or any other park owner, over the financial brink. " 'There is a range of rents which can be charged, all of which could be characterized as allowing a "just and reasonable" return . . . .' (*San Marcos Mobile Home Park Owners' Assn.* v. *City of San Marcos* (1987) 192 Cal.App.3d 1492, 1502 [238 Cal.Rptr. 290] . . . .)" (*West Hollywood Concerned Citizens* v. *City of West Hollywood* (1991) 232 Cal.App.3d 486, 497 [283 Cal.Rptr. 470].) The exclusion of land acquisition costs may yield a lower rate of return than would another formula, but that fact does not, standing alone, render it facially unconstitutional. (*Yee* v. *Mobilehome Park Rental Review Bd.* (1993) 17 Cal.App.4th 1097, 1104 [23 Cal.Rptr.2d 1].)

Because SPW appears to have incurred unusual land acquisition costs in 1992, the initiative's definition of net operating income may, if strictly applied to SPW, result in an unfair return on investment. However, that issue is not before us. We decide only that the initiative does not, on its face, require the City to reach "confiscatory results in its application . . . ," simply because it excludes from the definition of net operating income one expense typically incurred by park owners. (*Fisher* v. *City of Berkeley*, *supra*, 37 Cal.3d at p. 679.)

SPW next objects that the initiative is too narrowly drawn and does not permit a rent increase in the extraordinary case where maintenance of net operating income does not yield a fair return. Again, we disagree.

Rent control schemes may not indefinitely freeze profits, impose an absolute cap on rent increases, or prohibit a particular class of landlords from obtaining an increase. These inflexible restrictions will inevitably lead to confiscatory results. (37 Cal.3d at p. 683; *Apartment Assn. of Greater Los Angeles* v. *Santa Monica Rent Control Bd.*, *supra*, 24 Cal.App.4th at p. 1739; *Kavanau* v. *Santa Monica Rent Control Bd.*, *supra*, 19 Cal.App.4th at p. 735.) Nevertheless, a narrowly drawn ordinance will be facially valid if it grants the responsible agency discretion to provide a fair return by increasing rents in extraordinary cases. (*Fisher* v. *City of Berkeley*, *supra*, 37 Cal.3d at p. 683; *Apartment Assn. of Greater Los Angeles* v. *Santa Monica Rent Control Bd.*, *supra*, 24 Cal.App.4th at pp. 1738-1739; *Kavanau* v. *Santa Monica Rent Control Bd.*, *supra*, 19 Cal.App.4th at pp. 735-736.)

The initiative does not violate these rules. To the contrary, it directs the Commission to "determine rent adjustment applications pursuant to the

purposes. (*Palomar*, *supra*, 16 Cal.App.4th at p. 486.) The initiative at issue here does not suffer that defect, because it establishes 1984 as the base year. (§ 8.48.080, subd. (D).)

provisions of this Chapter," and to "adopt, promulgate, and amend and rescind administrative rules to effectuate the purposes of this chapter." (§ 8.48.060, subd. (B)(2)(4).) The purpose of the initiative is to "protect residents of mobilehome parks from excessive rent increases . . . , while at the same time providing a just and reasonable return to park owners." (§ 8.48.010, subd. (B).) Accordingly, the initiative grants the Commission discretion, in extraordinary cases, to increase rents as necessary to yield a just and reasonable return. (§ 8.48.010, subd. (B).) Thus, if SPW demonstrates to the Commission that the maintenance of net operating income approach deprives it of a fair return because of its land acquisition costs, the Commission would have discretion to grant a rent increase to provide SPW with a fair return. We must assume that the Commission will exercise its discretion in a constitutional manner and must, therefore, reject respondents' facial challenge. (*Fisher* v. *City of Berkeley*, *supra*, 37 Cal.3d at p. 684.)

### SPW Did Not Willfully Violate the Initiative.

The initiative allows appellants to recover treble damages "[i]n the case of a willful violation . . . ." (§ 8.48.110, subd. (A).) Appellants urge us to conclude that SPW willfully violated the initiative when it demanded a rent increase under section 66427.5. We decline the invitation.

It is undisputed that SPW demanded the rent increase only after the City declined to consider its application for an increase under the initiative. In connection with that decision, the City informed SPW that section 66427.5 governed rents at the Park and that the initiative no longer applied. Reliance upon the City's determination, although erroneous, was not unreasonable. As a matter of law, its conduct was not a willful violation of the initiative and appellants are not entitled to treble damages. (*Kwan* v. *Mercedes-Benz of North America, Inc.* (1994) 23 Cal.App.4th 174, 183 [28 Cal.Rptr.2d 371].)

### Conclusion

Section 66427.5 does not apply under the circumstances presented here. The initiative is constitutional on its face. Accordingly, the judgment is reversed. Costs to appellants.

Stone (S. J.), P. J., and Gilbert, J., concurred.