Filed 11/18/13 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| COLONY COVE PROPERTIES, LLC,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CITY OF CARSON et al.,<br><br>Defendants and Respondents. | B227092<br><br>(Los Angeles County<br>Super. Ct. Nos. BS124253 &<br>BS124776)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:*

It is ordered that the opinion filed October 21, 2013, be modified as follows:

page 7, line 20, the heading "1.  General Rent Increase Application" is replaced with the heading "1.  Appellant's Calculations";

page 7, line 21, the heading "a.  Initial Calculation" is deleted;

page 7, line 22, the phrase "an application for a" is deleted and the phrase "applications for a general rent increase and a supplemental or "fair return" rent increase.  Appellant sought a" is inserted in its place;

page 9, line 7, the heading "b.  Subsequent Calculations" is deleted;

page 11, line 8, the heading "2.  Supplemental Rent Increase Application" is deleted;

page 11, lines 9-10, the sentence "In September 2007, appellant also submitted a supplemental rent increase application, referred to as a "fair return" application."  and footnote 14 are deleted;

page 11, line 10 to page 12, line 1, the phrase "The supplemental application contained a" is deleted and the phrase "The rent increase applications included a" is inserted in its place;

page 12, line 11, the heading numbered "3" is renumbered "2";

page 16, line 5, the heading numbered "4" is renumbered "3";

page 18, line 4, the heading numbered "5" is renumbered "4";

page 19, line 20, the heading "1.  General Rent Increase Application" is replaced with the heading "1.  Appellant's Calculations";

2

page 19, line 21, the phrase "a new rent increase application" is deleted and the phrase "a new general rent increase application and a new supplemental "fair return" application" is inserted in its place;

page 20, line 10, the heading "2.  Supplemental Rent Increase Application" is deleted;

page 20, lines 21-22, the phrase "In September 2008, appellant also submitted a supplemental "fair return" application containing" is deleted and the phrase "The September 2008 rent increase applications included" is inserted in its place;

page 20, line 18, the heading numbered "3" is renumbered "2";

page 22, line 6, the heading numbered "4" is renumbered "3";

page 23, line 1, the heading numbered "5" is renumbered "4".

The petition for rehearing is denied.  The modification does not change the judgment.

_____

*WILLHITE, Acting P.J.          MANELLA, J.          SUZUKAWA, J.

3

Filed 10/21/13 (unmodified version)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| COLONY COVE PROPERTIES, LLC, | B227092 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. Nos. BS124253 & BS124776) |
| v. | |
| CITY OF CARSON et al., | |
| Defendants and Respondents. | |


APPEAL from judgments of the Superior Court of Los Angeles County, David P. Yaffe, Judge.  Affirmed in part, reversed in part.

Gilchrist & Rutter, Richard H. Close, Thomas W. Casparian and Kevin M. Yopp; O'Melveny & Myers, Matthew W. Close and Tamar M. Braz for Plaintiff and Appellant.

Aleshire & Wynder, William W. Wynder, Sunny K. Soltani and Jeff M. Malawy for Defendants and Respondents.

Appellant Colony Cove Properties, LLC, a Delaware limited liability company, is the owner of the Colony Cove Mobile Estates, a mobilehome park (the Park) containing approximately 400 spaces, located in respondent City of Carson (the City). At the time appellant purchased the Park, it was rent controlled.[1] Appellant submitted applications for rent increases in September 2007 and again in September 2008. After hearings in June 2008 and June 2009, respondent Carson Mobilehome Park Rental Review Board (the Board) approved increases in the monthly rent per unit of $36.74 and $25.02. Appellant contended that even after the rent increases approved by the Board, the rental income from Park residents was insufficient to cover its expenses, including interest payments on the $18 million loan it had secured to purchase the Park. Appellant maintained that to avoid becoming confiscatory, rents must be set at a level sufficient to provide a profit after payment of debt service. In two separate proceedings before the trial court (consolidated for appeal), the court denied appellant's petitions for writ of administrative mandamus seeking to overturn the Board's determinations. We conclude that substantial evidence supported the determination that the rent levels set by the Board provided appellant a fair return. Accordingly, we affirm the trial court's decision denying the petitions. We reverse only that portion of the court's order striking appellants' reservation of their federal claims.

---

[1] Shortly after purchasing the Park, appellant applied to convert the rental spaces to condominium-style ownership. The conversion was approved in 2009, permitting appellant to sell each space individually.

2

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Purchase of Property*

Appellant purchased the Park for $23,050,000 in April 2006, putting $5,050,000 down and financing the $18 million balance at a variable rate, which in 2007 was approximately 7 percent.[2] The Park had 404 spaces, of which 403 were available for rent.[3] At the time of the sale, the Park's tenants were paying rents averaging $408 per space per month, and the Park's gross income totaled approximately $2.2 million per year, including miscellaneous income from sources other than rent. The Park's "net operating income" (a figure calculated by subtracting regular operating expenses, but not debt service, from gross income) was $1.1 million. The prior owner's debt service was approximately $350,000 per year, leaving over $700,000 in cash profit.

B. *Rent Control Ordinance*

Since 1979, the City of Carson has had a "Mobilehome Space Rent Control Ordinance" (Carson Mun. Code, § 4700 et seq.; (Ordinance)). The Ordinance requires the Board to "grant such rent increases as it determines to be fair, just and reasonable." (Ord., § 4704(g).) In general, a rent increase is "fair, just and reasonable" if it "protects Homeowners from excessive rent increases and allows a fair return on investment to the Park Owner." (*Ibid.*) The Ordinance sets forth certain non-exclusive factors the Board is to consider in determining whether to grant an owner's request for rent increases, including (1) changes in the consumer price index for consumers in the Los Angeles-Anaheim-Riverside area; (2) the rent charged for comparable mobilehome spaces in the City; (3) the length of time since

---

[2]  The prior owner had paid $3.5 million for the Park eleven years earlier.

[3]  The final space was used by the Park's resident manager.

the last Board determination of a rent increase application; (4) any capital improvements undertaken and completed; (5) changes in property taxes or other taxes; (6) changes in utility charges; (7) changes in reasonable operating and maintenance expenses; (8) unusual repairs; and (9) services provided.  (*Ibid*.)

The City has adopted "Guidelines for Implementation of the Mobilehome Space Rent Control Ordinance" (the Guidelines).  The Guidelines provide that the factors in section 4704(g) of the Ordinance are to be used "to focus on changes in a park's income, expenses and circumstances, including changes in the general economy, to determine whether a rent increase is appropriate to allow the owner to keep earning a fair return . . . ," that "[n]o one factor . . . is determinative," and "the factors must be considered together and balanced in light of the purposes of the Ordinance and all the relevant evidence."  (Guidelines, §I(C-D).)  The Guidelines further provide that "[t]he Board cannot reconsider its decisions on a rent adjustment application after they have been embodied in a formal written resolution setting forth the findings of the Board.  Therefore, each rent increase application after the first application is evaluated only on the basis of changes in income, expenses, profit, the CPI, maintenance, amenities and services that have occurred since the date of the last increase approved by the Board."  (*Id*., ¶I.E.)

With respect to debt service as an allowable expense, the Guidelines provide that allowable expenses include "[d]ebt service incurred prior to adoption of the Ordinance to purchase or operate the park" and "[d]ebt [s]ervice necessarily incurred to operate the park after adoption of the Ordinance . . . if the financing arrangements were prudent and consistent with customary business practice." (Guidelines, § II(A)(2), subds. (d) & (e).)  However, debt service incurred to purchase a park after adoption of the Ordinance is an allowable expense only if "the purchase price paid was reasonable in light of the customary financing practices," and the applicant has "the burden of establishing the reasonableness of

4

the purchase price and financing procedures." (*Id*., §II(A)(2), subd. (f).) The Guidelines explain: "The reason for these general rules is that passing on increased debt service due to purchase at prices above those that can be justified by the income earned by the park under rent control or incurred by unusual financing methods, such as 100% financing, would defeat the purpose of rent control." (*Ibid*.)

The Guidelines go on to state that "in evaluating a rent increase application, the Board may consider, in addition to the factors specified in § 4704(g) of the Ordinance, a 'gross profits maintenance [GPM] analysis,' which compares the gross profit level expected from the last rent increase granted to the park prior to the current application ('target profit') to the gross profit shown by the current application." (Guidelines, §II(B).) According to the Guidelines, the GPM analysis is "intended to provide an estimate of whether a park is earning the profit estimated to provide a fair return, as established by the immediately prior rent increase, with some adjustment to reflect any increase in the CPI"; it is "an aid to assist the Board in applying the factors in the Ordinance," and is "to be considered together with the factors in § 4704(g), other relevant evidence presented and the purposes of the Ordinance." (*Ibid*.) The Guidelines expressly state that the GPM analysis is "not intended to create any entitlement to any particular rent increase." (*Ibid*.)

In October 2006, the Guidelines were amended to provide that the Board "may also consider, a 'maintenance of net operating income [MNOI] analysis,' which compares the net operating income (NOI) level expected from the last rent increase granted to a park owner and prior to any pending rent increase application (the so called 'target NOI') to the NOI demonstrated in any pending rent increase

application."[4] (Guidelines, §II(C).) Such MNOI analysis "is intended to provide another method to estimate whether any applicant for a rent increase is earning a constitutional fair return, as established by the immediately prior rent increase, with appropriate adjustment(s) to reflect changes in the CPI, and is a methodology approved by the courts in which changes in debt service expenses are not to be considered in the analysis (unlike a gross profits maintenance analysis, where such changes may be considered)." (Guidelines, §II(C)(2).)

The Guidelines state that "[t]he Ordinance assumes that the profit earned by park owners when the Ordinance was adopted provided a fair return because it was based on rents chosen by the owners prior to the regulation" (Guidelines, §I(C)) and further assumes that "park owners attempted to rebut that presumption when they first applied for an increase." (Guidelines, §IV(A).) The Guidelines further explain: "Most applications submitted to the Board have been based on the factors in the Ordinance and Park Owners rarely offer evidence concerning their investment in a park, the return being earned on the park or the return being earned by comparable mobilehome parks." (*Ibid*.) However, if an applicant believes "the park cannot earn a fair return without an increase greater than that permitted by application of the factors in the Ordinance," he, she or it may attempt to rebut the presumption by presenting additional evidence not specifically related to the Ordinance factors, including (1) the date the park was purchased; (2) the purchase price; (3) the rents charged and the net operating income of the park prior to the purchase; (4) an appraisal of the park at the time of purchase; (5) the amount of the

---

[4]     As explained in *Kavanau v. Santa Monica Rent Control Bd.* (1997) 16 Cal.4th 761, 768-769 (*Kavanau*), the MNOI formula ensures that net operating income remains constant by permitting landlords to recoup increases in ongoing operating expenses. To prevent erosion of net operating income over time, the formula typically also includes an inflation adjustment component. (*Ibid*.)

down payment and/or current amount of equity; (6) any capital improvements made; and (7) the "Overall Rate of Return [defined as "ratio of net operating income to purchase price" of comparable] mobilehome parks in jurisdictions with and without rent control at the time of the application." (Guidelines, § IV(A) (1-4).)

The Guidelines expressly state: "[The Board] will not consider return based on the current fair market value of a park or the value of park property for purposes other than use as a mobilehome park." (Guidelines, §IV(A)(4).) Further, "[s]ince mobilehome parks are unique investments, it is unlikely that the return on other types of investments would be found relevant by the Board. . . . . [T]he return on investments which do not have the potential for appreciation in value are not relevant." (*Ibid*.) The Guidelines recognize that even comparison with other types of rental housing is of limited relevance because owners of mobilehome parks do not have the responsibility or expense of maintaining the actual housing units, mobilehome parks experience much lower vacancy rates than other types of rentals, and mobilehome park residents invest in improvements which enhance the owner's investment. (*Ibid*.)

C. *Appellant's September 2007 ("Year 1") Rent Increase Applications*

1. *General Rent Increase Application*

a. *Initial Calculation*

In September 2007, appellant submitted to the Board an application for a rent increase of $618.05 per space per month.[5] The figure was derived from

---

[5] The Board had granted a general rent increase of $6.23 per space per month in September 2006, bringing the average rental to $414. That increase and a $11.14 five-year capital improvement rent increase were the subjects of prior writ petitions and an appeal, *Colony Cove Properties, LLC v. City of Carson Mobilehome Park Rental Review*
*(Fn. continued on next page.)*

calculations performed by appellant's expert, John P. Neet.[6] Neet assumed that appellant was entitled to a 9 percent per year return on the $23,050,000 purchase price of the Park, or $2,074,500 per year.[7] If appellant's debt service on the $18 million loan used to purchase the Park was taken into account, the Park's current income was approximately $900,000 less than appellant's expenses.[8] The requested rent increase would have resulted in almost $3 million in additional revenues every year. Neet called this calculation a "Net Operating Income (Including Debt Service)" analysis.

This analysis was subsequently criticized by the Board's experts as "meaningless" and "mak[ing no] sense" because appellant did not have $23 million

---

*Board* (Dec. 8, 2009, B208994) (nonpub. opn.). The issues were the propriety of (1) the Board's disallowance of $613,000 in attorney fees in calculating the Park's operating expenses; and (2) the Board's use of an amendment to the Guidelines that lowered the interest rate applied in calculating the amount needed to compensate the owner for capital improvements. The trial court granted the writ petitions solely with respect to an operating expense requiring an additional rent adjustment of $3.21 per space, and the Court of Appeal affirmed.

[6] Neet was a member of the Appraisal Institute, a licensed appraiser and a licensed real estate broker.

[7] The 9 percent expected return was allegedly based on data reported in the Investors Survey, 3rd Quarter 2007, which, according to Neet, indicated that "[f]or mobile home park acquisitions, the survey reports discount rate requirements in the range of 8.52% to 12.44%, with an average of 9.87%." "Discount rate[]" is essentially an estimate of the expected return on capital and includes not only income, but the expected profit from the property's appreciation. Neet concluded that a base discount rate of 10.5 percent would be appropriate and then deducted 1.5 percent to take into account expected appreciation, which he presumed would be low (half the rate of the estimated rise in the Department of Labor's Consumer Price Index (CPI)) due to the existence of the Ordinance regulating rents. In making his calculations, Neet assumed that interest rates would rise during the period the property was held.

[8] To reach that conclusion, Neet used $2,031,941 for appellant's gross income, $1,727,103 for its operating expenses, and $1,309,236 for its debt service (reportedly derived from appellant's financial statement for April 2006 to March 2007).

invested in the Park and if it had, there would have been zero debt service. Neet agreed the criticism was well-taken and made no further reference to this analysis -- or to the $618 rent increase it allegedly supported -- in his supplemental reports. Prior to the hearing on its application, appellant withdrew the contention that a monthly rent increase of $618 was required under any proper analysis.

### b. *Subsequent Calculations*

In connection with appellant's initial application, Neet conducted two additional analyses, which purported to justify lesser rent increases and which, with some adjustments, form the basis of appellant's current contentions concerning fair rent. Neet calculated, based on the same expected 9 percent return on the property's $23,050,000 million purchase price, that even excluding appellant's debt service, there would be a shortfall of $1.769 million, requiring an increase in rents of $365 per space per month.[9] Neet also calculated that in order for appellant to receive a return of 11.5 percent ($580,750) per year on its actual equity (the $5.05 million down payment), rents would need to be raised $327 per space per month when debt service was taken into account.[10] Neet called the

---

[9]    Neet concluded appellant's net operating income (gross income minus operating expenses) was $304,838, which, when deducted from the $2,074,500 "expected" 9 percent return, left $1,769,662.

[10]    Neet contended that the Investors Survey, 3rd Quarter 2007 data indicated that equity dividend rates in the range of 8.42 to 17.23 percent were required or expected by mobilehome investors. The 11.5 percent rate chosen by Neet was based on his opinion that "[w]here a particular property falls in the quoted range is dependent primarily on the market[']s perception of risk and potential for growth in excess of predicted norms." Acknowledging that rents in mobile home parks in Carson "increas[ed] at a rate slower than the rate of inflation (approximately 50% of the historic inflation rate)," Neet contended that this increased the "risk" of the investment and therefore should lead to a higher rate of return, which he initially calculated to be 14.5 percent and then adjusted due to the expected appreciation in the value of the property over time, which he assumed
*(Fn. continued on next page.)*

former calculation a "Net Operating Income" analysis and the latter calculation a "Net Income to Equity" analysis.[11]

After receiving the Board staff's initial analysis (discussed further below), which concluded that a significant portion of appellant's alleged operating expenses should be disallowed, Neet recalculated the rent increase required under his "Net Operating Income" analysis and concluded a lesser increase of $210 was warranted. Neet also recalculated the rent increase under his "Net Income to Equity" analysis and concluded an increase of $161.84 was warranted.[12]

---

to be 3 percent of the purchase price or 8 to 9 percent of the "equity component" (the $5,050,000 down payment). This led to an "appropriately supported" 11.5 percent "equity dividend rate."

[11]    In its brief, appellant uses the terms "return on value" for Neet's second calculation and "return on equity" for his third calculation. A true "return on value" analysis computes a return by comparing net operating income to the fair market value of the property. Courts have consistently rejected the contention that a rent control board must utilize a formula that calculates return based on fair market value. (See, e.g., *Fisher v. City of Berkeley* (1984) 37 Cal.4th 644, 680, fn. 33; *Baker v. City of Santa Monica* (1986) 181 Cal.App.3d 972, 979-980.) Because Neet began with the purchase price, his second calculation, as well as his third, are "'return on investment'" analyses. Such an approach compares net operating income with either the owner's purchase price (sometime referred to as the "'historical cost'") or with the owner's actual equity investment in the property (the down payment plus any paydown of principal). (See *Palomar Mobilehome Park Assn. v. Mobile Home Rent Review Com.* (1993) 16 Cal.App.4th 481, 487-488 [discussing differences between return on value and return on investment approaches].) Only when return on investment is based on the owner's equity is the expense of debt service taken into consideration in calculating fair return. (*Ibid.*; *Yee v. Mobilehome Park Rental Review Bd.* (1993) 17 Cal.App.4th 1097, 1104, fn. 5 ["The 'historical cost' standard treats the actual cost of the property including that represented by encumbrances . . . as the 'investment' and the net operating income with no deduction for interest paid on encumbering debt as the 'return.' The 'return on equity' standard . . . treats equity cost rather than total cost as the 'investment' and the net operating income after deduction of interest on encumbering debt as the 'return.'"] (Italics omitted.).)

[12]    Neet supplemented his report a few months later and concluded that due to inflation since the Park's purchase, the value of the $23,050,000 purchase price and
*(Fn. continued on next page.)*

10

In May 2008, while the application was pending, appellant submitted an MNOI analysis by Michael St. John, Ph.D.  For the base year, Dr. St. John used 1978 -- the year prior to imposition of rent control -- and concluded a $208.22 per space per month rent increase was necessary to maintain that year's net operating income based on indexing the 1978 net operating income at 100 percent of the reported increase in the CPI since 1978.[13]

### 2. *Supplemental Rent Increase Application*

In September 2007, appellant also submitted a supplemental rent increase application, referred to as a "fair return" application.[14]  The supplemental

---

appellant's $5,050,000 down payment had increased by 3.5 percent.  Using these figures, Neet calculated that under the "Net Operating Income" analysis, an increase of $224.33 was necessary, and under the "Net Income to Equity" analysis, an increase of $166.04 was required.  Later in the process, the Board staff realized that it had omitted increased property taxes from allowed expenses.  Neet did not revise his calculations to factor in increased property taxes.  In its brief, appellant contends that the final result using Neet's assumptions, but with property taxes included, would be $248.95 and $190.66, respectively.

[13]     Acknowledging the absence of any documentation of income and expense numbers from the prior owner, St. John stated that his figures for 1978 were "taken without adjustment from [the former owner's] 1980 rent increase application . . . ."  St. John concluded that the base year's net operating income was $587,518.  Applying the Department of Labor's determination that the CPI rose 231 percent between 1978 and 2007, St. John calculated that maintenance of 1978's net operating income would require 2007's net operating income to be $1.9 million.  St. John's analysis was submitted after the Board staff had prepared its preliminary report indicating some alleged operating expenses reported by appellant should be disallowed.  Based on figures for expenses adjusted downward by the Board staff, the Park's net operating income in 2007 was either just over or just under $1 million, depending on whether increased property taxes were taken into account.  In making his final calculation, St. John took the increase into account.

[14]     Supplemental applications are governed by paragraphs IV.A.1 through 4 of the Guidelines, the provisions permitting the owner to rebut the presumption that application of the factors in the Ordinance leads to a fair return by presenting additional evidence,
*(Fn. continued on next page.)*

11

application contained a Gross Profit Maintenance (GPM) analysis.[15]  The application stated that in order for appellant to maintain the 2005 (pre-purchase) gross profit, an increase of $388.85 per space per month was warranted. Essentially, it concluded appellant was entitled to approximately $800,000 in gross profits to match the prior owner's 2005 gross profits of $718,240, adjusted for inflation by 100 percent of the CPI.  To reach that figure, an additional $1.88 million in revenue was needed in view of appellant's much larger debt service. That figure, divided by 403 spaces and 12 months, equaled the requested $388.85 increase.

### 3. *Board Experts' Reports*

The Board hired its own expert, Kenneth Baar, Ph.D, who performed both a GPM analysis and an MNOI analysis.  Under Dr. Baar's GPM analysis, which used 2005 as the base year, increase in rents would have been in the $200 range (the precise number dependent on the rate used for the increase in the CPI between 2005 and 2007), and all but approximately $15 of it would be due to appellant's increased debt service.  However, Dr. Baar expressed the opinion that use of a GPM approach to calculate fair rent would not be appropriate because the amount appellant paid for the Park "was not 'reasonable in light of existing rents.'"  He

including purchase date and price, net operating income of the park prior to the purchase, an appraisal of the park at the time of purchase, the amount of the down payment, and the rate of return of comparable mobilehome parks in jurisdictions with and without rent control.  As it was prepared at the same time as the original application, the supplemental application used appellant's original expense numbers.

[15]     This analysis is similar to the MNOI analysis in that it uses a base year in which the return to the owner is assumed to be fair and then calculates adjustments to rent necessary to roughly maintain that same rate of return.  A significant difference is that the GPM analysis calculates gross profits rather than net operating income, and thus requires subtracting debt service.  (See Guidelines, §II(C)(2).)

12

also noted that "[i]n recent decades," some real estate investors "have accepted a very low rate of return at the outset in return for the prospects of appreciation and some tax shelter benefits." Dr. Baar expressed the opinion that appellant had paid an excessive price for the property and incurred negative cash flow based on its belief that it would automatically "obtain a substantial rent increase."[16] Dr. Baar stated that rate of return formulas which include debt service "suffer from the shortcoming that they are circular in the context of rent regulations. In the marketplace, investment is determined by the allowable returns. Therefore, it is circular to let the investment determine the allowable return. In effect, this approach allows the investor to set the allowable return by setting the investment." Dr. Baar expressed the additional concern that if debt service were generally to be considered in determining rent increases, "debt service arrangements may be manipulated for the purpose of obtaining larger rent increases," for example, by "refinanc[ing] at a lower interest rate or pay[ing] off [a] loan after the rent increase is granted." Dr. Baar reviewed the Board's past actions in resolving rent adjustment applications and concluded: "[I]t has not been the standard practice of the Board to grant substantial rent increases based on increases in debt service."

Dr. Baar ultimately concluded that in determining the amount to increase rent for a new owner with higher debt service, an MNOI analysis was more appropriate than a GPM analysis: "The rationale for an MNOI approach is that regulated owners are permitted an equal rate of growth in [net operating income] regardless of their particular purchase and financing arrangements. Therefore,

---

[16] An appraisal prepared by Rob Detling the year after the purchase had been attached to Neet's original report as an exhibit and was referred to by Neet to support his calculations. The appraisal stated: "There is a high probability that the rent control board will allow some, if not all, of the increased property taxes and mortgage interest occasioned by a March 30, 2006 sale to be passed through to the residents, increasing the rent level at the [Park] in the near term."

13

rents are regulated depending on increases in expenses and the inflation rate ([CPI]).” It becomes the investor's task to determine what investment and financing arrangements make sense in light of the growth in net operating income permitted under the fair return standard.” Although specific financing and purchase arrangements were not considered, the growth in net operating income allowed some level of increasing debt service and finance costs over time. Furthermore, “because value is a function . . . of net operating income, indexing [net operating income] leads to appreciation in the value of a property, which may be converted into a capital gain. This approach meets the twin objectives of ‘protecting’ the mobilehome owners from ‘excessive increases’ and providing park owners with a ‘fair return on investment.’”

Dr. Baar conducted an MNOI analysis, using 2005 as the base year.[17] Using the Park's 2005 net operating income of approximately $1.1 million, he calculated that to maintain that NOI after allowable adjustments, rents would need to be increased $8.61 if indexed at 50 percent of CPI, $12.12 if indexed at 75 percent of CPI and $15.65 if indexed at 100 percent of CPI.

The City also retained James Brabant as an expert, primarily to analyze Neet's reports and calculations.[18] Brabant pointed out discrepancies in Neet's calculations, including that Neet essentially used one figure for net operating

---

[17]    In a supplemental report, Dr. Baar explained the rationale for using 2005 rather than an earlier year as the base year: “After one individual park adjustment decision is made pursuant to the net operating income standard, the use of the original base year in the course of considering a subsequent application would constitute a ‘reconsideration’ of the evidence that provided the basis for the earlier determination. Furthermore, it could result in a ‘de facto’ modification of the prior decision in the sense the outcome of the new decision could be based on a different conclusion about what rent increases were reasonable since the [original] base year.”

[18]    Like Neet, Brabant was a member of the Appraisal Institute and a certified real estate appraiser.

income ($304,838) to justify his claim that a rent increase was needed, and another, much higher, figure ($1.1 million) to justify the purchase price paid by appellant. Brabant further criticized Neet's report for contending that 9 percent represented a reasonable rate of return, when the capitalization rate used to justify the sales price was 4.75 percent, and capitalization rates from six comparable sales ranged from 3.9 to 6.3 percent.[19] In this regard, Brabant stated: "If you perform an analysis that uses one rate to justify a purchase price and then use a higher rate for the fair return analysis, a rent increase will always be indicated." With respect to the 11.5 percent return used in Neet's "Net Income to Equity" analysis, Brabant stated that Neet failed to supply "any equity dividend rates extracted from sales of mobile home parks to support his use of an 11.5% rate," and concluded that the Board could "give little weight to or choose not to have confidence in this aspect of the Neet analysis."[20] Finally, to the extent Neet attempted to justify the high returns he deemed appropriate based on the riskiness of the investment, Brabant concurred with an opinion expressed by Dr. Baar that "'after a park has been constructed and occupied with mobilehomes, there is virtually no rental risk,'" stating that "[t]his conclusion has been supported and documented in countless studies and I have personally observed this phenomena in over 30 years of appraising mobile home parks." As a result of the low risk level, "the discount

---

[19] "[C]apitalization rate" is the ratio between a rental property's net operating income and its purchase price. Brabant obtained the capitalization rate figures for comparable sales from the Detling appraisal. Brabant found these figures for acceptable capitalization rates more credible than Neet's because Neet's analysis failed to include or consider capitalization rates from recent comparable sales.

[20] Dr. Baar had also criticized this aspect of Neet's analysis: "In essence, . . . [Neet] contends that because there is rent regulation[,] the park owner must be permitted more rent than otherwise would yield a fair return in order to provide a higher rate of return than the prevailing rate." Appellant continues to contend that an 11.5 percent rate is appropriate for a return on equity analysis.

15

rates for Mobile Home Park acquisitions are lower than the rates for apartments, office buildings, industrial properties and retail facilities . . . reflective, at least in part, of the lower risk of vacancy."[21]

### 4. *Board Staff's Analysis*

The Board's staff reviewed the applications and in February 2008 prepared a report. The report concluded appellant's operating expenses had been overstated and that the Park's current net operating income was over $1 million.[22] Even taking debt service into account, there was a shortfall of less than $200,000. With respect to appellant's MNOI analysis and specifically its contention that the appropriate base year was 1978, the report stated: "As the Board is aware, each application has historically been reviewed and evaluated only for the period of time since the park's last public hearing. . . . In addition, the current revised guidelines for the implementation of the Ordinance specifically address this issue and preclude the Board from reconsidering past actions . . . ." With respect to the

---

[21] The Detling appraisal stated: "The mobile home spaces at the subject property are currently 100% occupied. The comparables listed in the Market Overview section indicate an adjusted overall vacancy rate of 0.0% for stabilized parks in the subject's general area. Historically, once a mobile home park is fully occupied, occupancy remains relatively high. This is due to the high cost of moving a home, the stability of the resident base, and the significant investment residents sometimes make on landscaping and improvements on their individual spaces. When residents do leave the park, their homes are usually sold 'in place,' with no lost rent accruing to the park owner."

[22] The staff report concluded that expenses for the 2006 to 2007 period were $2.198 million, including $1.254 million for debt service. The alleged operating expenses disallowed primarily consisted of (1) attorney fees incurred as the result of appellant's attempt to convert the Park to condominium-style ownership, its attempt to add additional spaces to the Park, and its challenges to prior Board decisions; and (2) expenditures on capital improvements, which should have been (and subsequently were) the subject of a separate application for a temporary rent increase. Appellant does not challenge these conclusions and adjustments on appeal.

16

CPI increase used in appellant's MNOI analysis, the report stated: "[Appellant's] calculation utilizes . . . 100% of the CPI, when arguably a lesser amount such as 75% and or 50% of the CPI increase may be adequate under the particular circumstances of a given application . . . ."

The staff conducted its own GPM analysis. Using a slightly lower CPI, based more precisely on the date of the applications, the date of the last rent increase (2006), and the adjusted figures for operating expenses, the report stated that in order for appellant to obtain the same income as the prior owner, an increase of $200.93 per space per month would be required, almost all of it the result of appellant's increased debt service.[23] The report advised that the GPM analysis was "merely a tool to aid the Board in making its decision."

The staff report noted that a rent increase had been approved in 2006 and stated that another option was simply to raise rents in the amount of the increase in CPI, or some fraction of the CPI since that time, which would have resulted in increases by amounts between $6.08 and $15.94. The report stated that the two comparable (rent-controlled) mobilehome parks in the City had average rents of $543.35 and $300.57, compared to the Park's then-average of $414.25.

The staff recommended that the Board permit a rent increase of $15.65 in accordance with Dr. Baar's MNOI analysis using 100 percent of CPI. Subsequently, the staff realized that Dr. Baar had not taken into account the increase in property taxes caused by the transfer of the property from the previous owner to appellant. Including increased property taxes in its determination, the

---

[23]     The report also contained calculations based on using 75 percent and 50 percent of CPI instead of 100 percent, but as the base period was only a year prior to the application, the differences were slight -- $200.93 versus $198.56 or $196.23.

staff concluded that a higher increase was warranted: $33.23 if indexed at 50 percent of CPI, $36.74 at 75 percent of CPI, or $40.27 at 100 percent of CPI.

### 5. *Hearing and Determination*

A hearing before the Board took place on June 11, 2008. Brabant testified and reiterated his view of the problems and discrepancies in Neet's report. He again explained that studies showed mobilehome park ownership was a low risk investment. He further explained that capitalization rate is a measure of the overall rate of return on a property based on a ratio of its net operating income to its purchase price, that Neet's calculations represented an attempt to arrive at an inflated capitalization rate to justify the rent increase appellant sought, and that based on comparable sales, 4.75 percent represented an appropriate capitalization rate for the Park. Brabant pointed out that the figures used in the Detling appraisal to justify the purchase price demonstrated that the property could not cover debt service in the amount incurred.

Dr. Baar testified concerning the appropriate formula to use to calculate fair return. He expressed the view that the MNOI approach was preferable to other possible approaches because "it provides . . . the right to a steady growth of net operating income [that] is consistent with the purposes of the ordinance [--] protecting residents from unreasonable increases and allowing a fair return." He stated that permitting increases in rent based on debt service would defeat rent control and noted that the amount of debt on a property could easily be manipulated. He testified that even using an MNOI base year of 1978, at a more appropriate rate of increase of 40 or 50 percent of CPI, the rent increase would be $75 or $102 when property taxes were credited, rather than the $208 Dr. St. John calculated.

Neet testified that the property was purchased on the open market at a price sufficient to beat other prospective purchasers, and that the loan was a typical one because appellant put 20 percent down and 80 percent was financed by a reputable third party lender. He reiterated his conclusion that a 9 percent return on value or a 11.5 percent return on equity were reasonable discount rates based on reported surveys of expectations of real estate investors. He testified that investments such as government bonds and certificates of deposit were returning 4.5 to 5 percent at the time of his analysis.

Detling testified that he appraised the Park based on comparisons with other similar properties, including 12 sales comparables.[24] He had calculated the capitalization rate of 4.75 percent based on the sales price and the projected first year of net operating income, and concluded the rate of return was "relatively risk free" because the rents were below market and there was no real risk that they would decrease. He further testified that the terms of the loan and the interest rate were "within market parameters."

At the hearing, the Board approved a resolution granting a rent increase in the amount of $36.74 per space per month, a total of $177,675 per year.

D. *Appellant's September 2008 ("Year 2") Rent Increase Applications*

    1. *General Rent Increase Application*

On September 28, 2008, appellant submitted a new rent increase application to the Board. Neet again provided "Net Operating Income" and "Net Income to Equity" analyses. He claimed that in the preceding year, the Park's gross income was $2,053,692 and its operating expenses were $1,512,273, resulting in net operating income of $541,419. Using a 8.75 percent expected return on value, he

---

[24]     Detling included only the "six primary sales comparables" in the written appraisal.

19

contended an increase in the amount of $336.76 per space per month was warranted.[25]  Using the same $541,419 for net operating income and deducting $1,353,506 allegedly spent on debt service, he concluded the Park was losing $812,177 per year.  Applying the 11.5 percent figure used to calculate expected return on equity for the prior year's application and an "inflation adjusted equity investment" of $6,800,000, he calculated the expected return was $782,000.  Adding $782,000 to $812,177, he concluded the shortfall was $1,594,177, necessitating a rent increase of $329.65.

### 2. *Supplemental Rent Increase Application*

In September 2008, appellant also submitted a supplemental "fair return" application containing a GPM analysis.  Based on income of $2,053,692, expenses of $2,865,869 (including debt service of approximately $1.3 million), and a target gross profit of $843,934, appellant claimed a shortfall of $1,656,111 and contended an increase of $342.46 per space was required to maintain the pre-purchase gross profit.

### 3. *Board Experts' Reports*

The Board again retained the services of Dr. Baar and Brabant to respond to appellant's rent increase applications and Neet's analysis.  Dr. Baar noted that "the

---

[25]  Neet first adjusted the purchase price of $23,050,000 upward to $24,800,000 (7.5725 percent, reportedly to account for inflation), and then multiplied by 8.75 percent to obtain the required net operating income of $2,170,000.  Neet reportedly derived the 8.75 percent figure from the Investors Survey, 3rd Quarter 2008, which allegedly indicated that for mobile home park acquisitions, the expected discount rate was in the range of 7.52 percent to 11.77 percent.  Opining that the risk factor required a discount rate near the upper end of the range, he concluded a rate of 10.25 percent would be appropriate.  He reduced that figure by 1.5 percent, one-half of the expected annual CPI of 3 percent, to account for appreciation.

20

applicant's claim for a right to a rent increase is principally based on a claim of a right to cover the debt service increase since the purchase of the property and a claim to a right to an 8.75% rate of return on the purchase price. Each of these claims was addressed in the prior [rent application proceeding] . . . ." Dr. Baar again advocated in favor of the MNOI approach, because it "permitted an equal rate of growth in [net operating income] regardless of [the owner's] particular purchase and financing arraignments" and required the investor "to determine what investment and financing arrangements make sense in light of the growth in net operating income permitted under the fair return standard."[26] He described it as superior to other methods of calculating a fair return, such as GPM or return on investment, because it did not permit the park owner to "'regulate[]'" rents by "setting the investment and/or the level of debt service." Dr. Baar continued to criticize Neet's contention that "because there is rent regulation the park owner must be permitted more rent than otherwise would yield a fair return in order to provide a higher rate of return than the prevailing rate."

Brabant reiterated his criticisms of Neet's analysis, particularly in using the 4.75 percent capitalization rate to justify the price paid for the property, but then claiming that a much higher rate was necessary to produce a fair return. He again observed that Neet's 9 percent return rate was not based on a direct comparison of capitalization rates from comparable mobile home parks in California, as was the 4.75 percent rate set forth in the Detling appraisal. The Detling appraisal further established that when acquired by appellant, "the property . . . was not producing anything approaching the income necessary to cover [appellant's] debt service . . . and provide a positive cash flow . . . . In fact with a net income before debt service

---

[26]     Dr. Baar's MNOI calculation would have provided for an increase in Year 2 of between $23.06 and $26.97.

of $1,110,009 and debt service of $1,309,236 the equity dividend projected for the first year for the applicant's ownership was a negative $199,227." Brabant reiterated that there was very little risk involved in owning a fully constructed and occupied mobilehome park.

### 4. *Board Staff's Analysis*

Considering the factors set forth in the Ordinance, the Board's staff found that the CPI had increased 1.06 percent above the level considered at the time of the prior adjustment. The staff further found that rents at the Park continued to be midway between the averages charged at nearby parks. The staff recognized that there had been capital improvements, including some improperly included as operating expenses, but recouping those expenses required a separate application for a temporary rent increase. The staff also recognized that property taxes and utility expenses had increased slightly. It found that overall expenses had risen by $192,029, primarily due to an increase in the variable rate on the Park's mortgage.[27]

The staff performed a GPM analysis, using the prior year as the base year, which supported a rent increase of $39.71 per space per month due to the increase in operating expenses and debt service. It also performed an MNOI analysis, which supported an increase of $25.02 based on the increase in operating expenses and 75 percent of CPI. The staff recommended an increase in accordance with the MNOI analysis, which would raise rents at the Park to an average of $476.01 per space per month.

---

[27]     As it had the prior year, the staff concluded that a number of items had been improperly included in the operating expense category. It concluded that appellant's expenses, including debt service of $1,353,596, totaled $2,509,263.

### 5. *Hearing and Determination*

The hearing on appellant's second rent increase applications took place on June 10, 2009. Dr. Baar testified that the issues raised in the 2008 rent increase applications were the same as those raised in the prior year when the Board concluded that the debt service was not reasonable in light of the existing rents. He explained that rates of return had been on the decline since the 1990's and the early 2000's and that current rates of return on rental properties were six percent on average, subject to a great deal of variance. He expressed the opinion that a realistic rate of return analysis must take into account the appreciation that was likely to occur. A member of the Board's staff pointed out that within days of purchasing the Park, appellant sent out notices announcing plans to convert the Park to condominium-style ownership, indicating that appellant paid a premium price for the Park and was expecting a temporary loss which would be made up when the spaces were sold.

Neet testified that according to surveys, the rate of return expected by real estate investors was commensurate with the numbers in his report and analysis. Detling testified that his post-purchase appraisal was justified by offers received from other parties and recent sales of six other mobilehome parks in California, three of which were rent-controlled and three of which were not.

At the conclusion of the hearing, the Board approved an increase in the amount of $25.02 per space per month.

### E. *Federal Court Action*

After the Board's action on the 2007 applications, appellant filed suit against respondents in federal court, asserting facial and as-applied takings claims and facial and as-applied due process claims. It also sought a writ of administrative mandate under state law. The district court found that the facial takings and due

process claims were time barred because the Ordinance had been enacted in 1979, and that the 2006 amendments to the Guidelines did not revive the claims, as they did not amend the Ordinance.  The court further found that the Guidelines "d[id] not significantly alter the effect of the Ordinance on [appellant]" because "[t]he Ordinance permits the Board to use any formula it chooses that meets the purposes of the Ordinance, whether or not the formula was mentioned in the Guidelines."

The district court found the as-applied takings claim unripe because appellant had never sought compensation under California law as required by *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City* (1985) 473 U.S. 172 (*Williamson*).[28]  Finally, the court concluded that appellant had failed to state an as-applied substantive due process claim because there was no fundamental constitutional right to raise rents, and the Board's actions did not amount to egregious or shocking official conduct lacking a legitimate government interest.  Accordingly, by order dated November 24, 2009, the court dismissed appellant's facial takings claim, facial due process claim, and as-applied due process claim with prejudice, and dismissed the as-applied takings claim without prejudice.  The court then dismissed appellant's state law claim seeking a writ of administrative mandate, first concluding it had supplemental jurisdiction over the pendant claim, but then declining to assert it on the ground that there was significant potential for inconsistent rulings because appellant would be seeking

---

[28]     In *Williamson*, the Supreme Court held that to bring a takings claim in federal court based on state action, a plaintiff must satisfy a two-prong test.  "First, a plaintiff must demonstrate that 'the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.' [Citation.]  Second, the plaintiff must have sought, and been denied, 'compensation through the procedures the State has provided for doing so.'" (*Colony Cove Props. LLC v. City of Carson* (9th Cir. 2011) 640 F.3d 948, 958, quoting *Williamson, supra,* at pp. 186, 194-195.)

the same relief in state court when it pursued its as-applied takings claim under state law.

While the instant appeal was pending, the Ninth Circuit affirmed the district court's rulings in a published opinion: *Colony Cove Props. LLC v. City of Carson, supra,* 640 F.3d 948. The circuit agreed that appellant's facial takings claim was untimely, that the 2006 amendments to the Guidelines did not alter the 1979 Ordinance, and that appellant's as-applied takings claim was unripe. (*Id*. at pp. 957-959.)[29] The court further found the factual allegations of the complaint insufficient to support appellant's as-applied due process claim that the Board's decision was arbitrary, irrational, and lacking any reasonable justification in the service of a legitimate government interest. (*Id*. at pp. 961-962.)

F. *Proceedings Below*

On December 23, 2009, appellant filed a petition for writ of administrative mandate seeking review of the Board's 2008 determination of its September 2007 rent increase applications. On February 3, 2010, appellant filed a second petition for writ of administrative mandate seeking review of the Board's 2009 determination of its September 2008 rent increase applications. Both petitions contended that the pertinent rent increase determination was arbitrary, unsupported by evidence, and grossly insufficient to provide appellant with a fair return. Specifically, the petitions contended (1) use of the MNOI approach was unfair because it was first discussed in the Guidelines after appellant purchased the Park; (2) the only proper base year for an MNOI analysis was one prior to institution of rent control; (3) the full rate of inflation according to the CPI should have been

---

[29]     In the appeal to the Ninth Circuit, appellant did not challenge the dismissal of its facial due process claim. (See *Colony Cove, supra,* 640 F.3d at p. 954, fn. 2.)

25

used in calculating fair rent, and there was no rational basis for the Board's decision to base the increase on 75 percent of CPI; and (4) the Board failed to properly consider appellant's fair return application. The first petition contended that a minimum rent increase of $200 was necessary for appellant to earn a fair return in Year 1. The second petition contended that the minimum necessary rent increase in Year 2 was $250.

Appellant's petitions included a section entitled "Reservation of Federal Claims," which stated: "Under *England* [*v. Medical Examiners* (1964) 375 U.S. 411 (*England*)] and its progeny, [appellant] hereby reserves any and all federal claims arising from the facts alleged herein for litigation in federal court and gives notice to all parties and the Court that any resolution of state-law issues herein shall not constitute a binding resolution of parallel or related federal issues and shall have no claim or issue preclusion for [appellant's] federal claims. [Citation.]" After the first petition was filed, respondents moved to strike the reservation of federal claims. Respondents argued that the reservation was improper, because "an *England* reservation can only be asserted where there is a pending federal action in which the federal court has exercised . . . abstention [under *Railroad Commission of Texas v. Pullman Co.* (1941) 312 U.S. 496 (*Pullman*)]. [Appellant] has not alleged (because it cannot) that there is such a pending federal action (nor is there, in fact, any pending federal action). [¶] [Appellant] did file a federal district court complaint on October 27, 2008, which arose from the same facts as this Petition, but the district court dismissed all of [appellant's] claims in that action on November 24, 2009, on grounds other than *Pullman* abstention, and did not retain jurisdiction. There is no pending federal action in which the federal court has exercised *Pullman* abstention." (Italics omitted.)

26

The court granted the motion to strike. After appellant filed the second petition, the parties entered into a stipulation and order, subsequently approved by the court, that the *England* reservation in that petition would be stricken, and that the stipulation and order would have the same impact on appellant's appellate and federal court rights as if the court had entered an order striking the reservation after a full contested hearing on the merits.

Following a hearing, on June 30, 2010 the court denied the first petition on the basis of "three established legal principles that govern this type of case": "1. There is no single constitutionally required formula which must be used when government seeks to regulate the price charged for a good or service. A governmental entity may choose to regulate pursuant to any fairly constructed formula even though other proper formulas might allow for higher prices. [¶] 2. There is a range of rents which can be charged, all of which could be characterized as allowing a just and reasonable return. [¶] 3. The MNOI . . . approach has been praised by commentators for both its fairness and ease of administration. The board is not obliged to reject an MNOI analysis just because a historical formula, using the actual cost of acquisition would yield a higher rent increase. [Citation.] [¶] Under the foregoing principles, the landlord cannot insist that a fair return must be calculated on the basis of what it paid for the mobile home park, instead of an MNOI analysis. Nor can the landlord insist that an MNOI analysis must use a pre-rent control base year. The selection of a base year because it was a year in which the then owner of the mobile home park received a rent increase which it did not challenge as unfair, is a rational basis for selecting the base year, and the landlord cannot insist upon another base year, equally reasonable, just because it yields a higher rent increase. [¶] . . . It is the governmental entity that administers the rent control ordinance that gets to choose among proper formulas and use an approach

27

that both protects the tenants from excessive rent increases and allows a fair return on investment to the landlord."

The parties entered into a stipulation and order, subsequently approved by the court, that the decision and judgment entered on the first petition (Year 1) would be adopted as the decision and judgment in the second petition (Year 2) "and will have the same impact on [appellant's] appellate and federal court rights as if [] the Court had entered an order denying the [petition]. The court thereafter entered a judgment denying the second petition "[f]or the reasons set forth in the Court's Minute Order [in the proceedings on the first petition] on June 30, 2010 . . . ." Appellant separately appealed the judgments entered on the petitions. The appeals were consolidated.

## DISCUSSION

It has long been established that local rent control ordinances are constitutional "exercises of governmental authority" and """"not per se takings." [Citation.]'" (*Santa Monica Beach, Ltd. v. Superior Court* (1999) 19 Cal.4th 952, 962, quoting *Pennell v. City of San Jose* (1988) 485 U.S. 1, 12, fn. 6; see *Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 158-159.) Rent control regulations are permissible if they are "reasonably calculated to eliminate excessive rents and at the same time provide landlords with a just and reasonable return on their property." (*Birkenfeld v. City of Berkeley, supra,* at p. 165.) In the context of price control, which includes rent control, a regulation that "deprive[s] investors of a 'fair return'" becomes "'confiscatory'" and violates due process as well as the takings clauses of the state and federal Constitutions. (*Kavanau*, *supra*, 16 Cal.4th at p. 771.)

Appellant contends that the rent increases approved by the Board using its MNOI analysis required it to operate the Park at a loss, resulting in the application

28

of the City's rent control Ordinance in a confiscatory and unconstitutional manner. Specifically, appellant maintains that the Board was obliged to apply a formula that ensured gross profits and a positive cash flow, taking its debt service into account. Alternatively, appellant contends the Board erred in using 2005 as the base year for its MNOI analysis and applying an inflation adjustment component equal to 75 percent of the CPI. For the reasons discussed, we disagree.

### A. *Standard of Review*

An aggrieved landlord who believes that the rent allowed by a rent control board or agency does not provide a fair return "may seek judicial review of an administrative rent control decision by filing a petition for a writ of mandate in the Superior Court. [Citations.] 'The inquiry in such a case shall extend to the questions whether the respondent [agency] has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the [agency] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.'" (*MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 216, quoting Code Civ. Proc., § 1094.5, subd. (b).)

Appellate review of the factual basis behind a decision by a rent control board or agency is governed by the substantial evidence standard. (*MHC Operating Limited Partnership v. City of San Jose*, *supra*, 106 Cal.App.4th at p. 217; *Carson Harbor Village, Ltd. v. City of Carson Mobilehome Park Rental Review Bd.* (1999) 70 Cal.App.4th 281, 287.) In applying the standard, we focus on the decision of the agency rather than that of the trial court and "'answer the same key question as the trial court . . . whether the agency's findings were based on substantial evidence. [Citations.]'" (*MHC Operating Limited Partnership v.*

29

*City of San Jose*, *supra*, 106 Cal.App.4th at pp. 218-219.)  "[W]e consider all relevant evidence in the administrative record, beginning with the presumption that the record contains evidence to sustain [the agency's] findings of fact."  (*TG Oceanside, L.P. v. City of Oceanside* (2007) 156 Cal.App.4th 1355, 1371.)  Our goal is to determine whether substantial evidence supports the agency's finding that the rents were set at a level sufficient to provide the owner a non-confiscatory, fair return.  "[I]n the absence of an unconstitutional and confiscatory taking, the courts [are] not authorized to interfere with the actions of the local rent boards . . . ."  (*City of Berkeley v. City of Berkeley Rent Stabilization Bd.* (1994) 27 Cal.App.4th 951, 959.)

To the extent the administrative determination rests on the agency's interpretation or application of an ordinance, it presents a question of law which we review independently.  (*MHC Operating Limited Partnership v. City of San Jose*, *supra*, 106 Cal.App.4th at p. 219.)  However, a rent control board's interpretation of a rent control ordinance and its implementing guidelines is entitled to considerable deference.  (*Id.* at pp. 219-220; *Carson Harbor Village, Ltd. v. City of Carson Mobilehome Park Rental Review Bd.*, *supra*, 70 Cal.App.4th at p. 287.)  "The burden is on the appellant to prove the board's decision is neither reasonable nor lawful."  (70 Cal.App.4th at p. 287.)

B.  *2007 Rent Increase Applications (Year 1)*

1.  *Use of MNOI Analysis to Establish Fair Rent*

To avoid becoming unconstitutionally confiscatory, a rent control regulation system must be applied so as to provide investors a "'fair return.'"  (*Kavanau*, *supra*, 16 Cal.4th at p. 771; *Galland v. City of Clovis* (2001) 24 Cal.4th 1003, 1021 (*Galland*).)  "The term 'fair return' is incapable of precise definition . . . ."  (*Donohue v. Santa Paula West Mobile Home Park* (1996) 47 Cal.App.4th 1168,

30

1177.)  It is said that it must be high enough "to encourage good management, reward efficiency, discourage the flight of capital, and enable operators to maintain their credit." (*Cole v. City of Oakland Residential Rent Arbitration Bd*. (1992) 3 Cal.App.4th 693; accord, *Oceanside Mobilehome Park Owners' Assn. v. City of Oceanside* (1984) 157 Cal.App.3d 887, 907; see *Kavanau*, *supra*, 16 Cal.4th at p. 772.)  It has also been said that a valid price control scheme must permit an efficiently run company to earn a return commensurate with returns on investments having corresponding risks. (*Fisher v. City of Berkeley*, *supra*, 37 Cal.3d at p. 683; *Donohue v. Santa Paula West Mobile Home Park*, *supra*, at p. 1177.)  On the other hand, a fair return must not be "'so high as to defeat the purposes of rent control nor permit landlords to demand of tenants more than the fair value of the property and services which are provided.'" (*Oceanside Mobilehome Park Owners' Assn. v. City of Oceanside, supra*, 157 Cal.App.3d at p. 907.)  "Thus, '[the] rate of return permitted may not be as high as prevailed in the industry prior to regulation nor as much as the investor might obtain by placing his capital elsewhere." (*Ibid*.)  As our Supreme Court explained in *Galland,* 24 Cal.4th 1003, "comparison of the rate of return of rent-controlled mobilehome parks with those of non-rent-controlled parks . . . is of limited utility in establishing the constitutional minimum rate of return" because "it is obviously not the case that a rent-controlled investment must earn the same as a non-rent-controlled one." (24 Cal.4th at pp. 1026-1027.) Moreover, "'"[s]ome lessening of appreciation is a necessary consequence of any rent control, since future appreciation is to a significant extent a function of increased rental income.  [Citation.]  It is one of the very sources of long-term appreciation -- inflated rents -- that rent control measures are intended to restrict." [Citation.]'" (*Id*. at p. 1026.)

The Supreme Court has held that rent control ordinances may incorporate "any of a variety of formulas" for calculating rent increases and satisfy the fair

return standard. (*Kavanau*, *supra*, 16 Cal.4th at p. 761.) In *Fisher v. City of Berkeley*, *supra*, 37 Cal.3d at pp. 679-680, the Court cited authorities advocating a number of different approaches and stated: "[R]ent control agencies throughout this state and the nation have employed a veritable smorgasbord of administrative standards by which to determine rent ceilings. [Citations.] As we recently stressed . . . , 'rent control agencies are not obliged by either the state or federal Constitution to fix rents by application of any particular method or formula.' [Citations.] [¶] . . . [S]election of an administrative standard by which to set rent ceilings is a task for local government . . . not the courts." (37 Cal.3d at pp. 679-681, quoting *Carson Mobilehome Park Owners' Assn. v. City of Carson* (1983) 35 Cal.3d 184, 191.)[30] Determining whether a particular rent control determination or scheme is confiscatory depends on "the overall result of the rent-setting process, not the method employed or any particular exemption legislated . . . ." (*Galland*, *supra*, 24 Cal.4th at p. 1028.)

A rent control board, in deciding which formula to apply, has no obligation to choose the one that would provide the owner the highest rate of return. (*Rainbow Disposal Co. v. Escondido Mobilehome Rent Review Bd.* (1998) 64 Cal.App.4th 1159, 1172.) "[T]he term 'fair rate of return' . . . refers to a constitutional minimum within a broad zone of reasonableness." (*Galland*, *supra*,

---

[30] In *Carson Mobilehome Park Owners' Assn. v City of Carson*, the Supreme Court upheld the underlying Ordinance against a facial challenge brought by a group of mobilehome park owners who contended that the Ordinance was unconstitutional because it advocated no specific formula and, therefore, "fail[ed] to provide sufficient standards to guide the Board in acting on applications . . . ." (*Carson Mobilehome Park Owners' Assn. v City of Carson, supra*, 35 Cal.3d at pp. 190-191.) The court held the fact that the Ordinance "does not articulate a formula for determining just what constitutes a just and reasonable return does not make it unconstitutional." (*Id*. at p. 191.) By stating that rent increases would be granted upon a determination that they are "'just, fair and reasonable'" and specifying an illustrative list of relevant facts the Board was to consider, the Ordinance provided sufficient guidance. (*Id*. at pp. 190-191.)

24 Cal.4th at p. 1026.) "[A] governmental entity may choose to regulate pursuant to any fairly constructed formula even though other proper formulas might allow for higher prices." (*Palomar Mobilehome Park Assn. v. Mobile Home Rent Review Com.*, *supra*, 16 Cal.App.4th at p. 487.) "Regulations that enable the company to operate successfully cannot be condemned as invalid, even though they might produce only a meager return." (*TG Oceanside, L.P. v. City of Oceanside*, *supra*, 156 Cal.App.4th at p. 1373.) "For those price-regulated investments that fall above the constitutional minimum, but are nonetheless disappointing to investor expectations, the solution is not constitutional litigation but, as with nonregulated investments, the liquidation of the investments and the transfer of capital to more lucrative enterprises." (*Galland*, *supra*, at p. 1026.) The goal is to set rents at the point at which "an efficient enterprise" can operate successfully. (*Id.* at p. 1021.)

Courts have approved a number of approaches taken by rent control boards to calculate fair return. (See, e.g., *Cotati Alliance for Better Housing v. City of Cotati* (1983) 148 Cal.App.3d 280, 286-288 [approving return on investment approach, where "investment" was defined as initial cash outlay plus payments toward principal and value of any subsequent improvements];[31] *Palos Verdes Shores Mobile Estates, Ltd. v. City of Los Angeles* (1983) 142 Cal.App.3d 362, 371

---

[31]     Appellant cites *Cotati* for the proposition that the minimum standard for fair rent is "that amount which will permit the property to generate income sufficient to cover the costs of operation and the servicing of reasonable financing and to ensure the return of a reasonable profit." (*Cotati Alliance for Better Housing v. City of Cotati, supra,* 148 Cal.App.3d at p. 294.) The formula at issue in *Cotati* contained a return on investment component, with investment defined as initial cash outlay plus any payments made toward principal. (*Id.* at pp. 286-287.) That approach to calculating fair return may require consideration of the expense of debt servicing. (*Ibid.*; see also *Yee v. Mobilehome Park Rental Review Bd.*, *supra*, 17 Cal.App.4th at pp. 1106-1107 [agency improperly failed to consider mortgage interest payments required by return on equity formula it adopted].) We do not read the court's statement as intended to apply where other approaches are taken to calculating fair return.

[upholding a "'maintenance of profit'" approach enabling the landlord to maintain same net profit as obtained in the last unregulated year].)  The MNOI formulation used by the Board has been approved by multiple courts where, as here, it includes an inflation adjustment component and where the regulations contain a mechanism for adjustments to account for capital improvements.  (See, e.g., *TG Oceanside, L.P. v. City of Oceanside*, *supra*, 156 Cal.App.4th at pp. 1371-1372; *Donohue v. Santa Paula West Mobile Home Park*, *supra*, 47 Cal.App.4th at pp. 1177-1178; *Oceanside Mobilehome Park Owners' Assn. v. City of Oceanside*, *supra*, 157 Cal.App.3d at p. 902; *Rainbow Disposal Co. v. Escondido Mobilehome Rent Review Bd.*, *supra*, 64 Cal.App.4th at p. 1172.)

The MNOI approach does not focus on how much the owner chose to pay for a rent-controlled property or how the purchase was financed.  That fact does not render it constitutionally invalid.  In *Donohue v. Santa Paula West Mobile Home Park*, where the rent control ordinance permitted adjustments to "'maintain net operating income'" and specifically excluded from consideration "'[m]ortgage principal [and] interest payments,'" the court rejected the owner's facial challenge to the ordinance:  "Numerous courts . . . have acknowledged that the [MNOI] approach is constitutionally valid," even though it ignores "certain expenses incurred by the landlords" in determining NOI, including "land acquisition costs . . . ."  (*Donohue v. Santa Paula West Mobile Home Park*, *supra*, 47 Cal.App.4th at p. 1178; see *Rainbow Disposal Co. v. Escondido Mobilehome Rent Review Bd.*, *supra*, 64 Cal.App.4th at p. 1172 [rent board need not reject MNOI merely because formula using owner's actual cost of acquisition yielded higher rent increase].)

Indeed, the MNOI standard has been praised by courts and commentators for "its fairness and ease of administration" (*Palomar Mobilehome Park Assn. v. Mobile Home Rent Review Com.*, *supra*, 16 Cal.App.4th at p. 486), because it "'recognizes that in the rental housing market, ratios of rental income to value,

34

equity, and gross income vary substantially among buildings. Therefore, rather than designating a particular rate of return as fair, [MNOI] standards pursue the best available option, which is to preserve prior [net operating income] levels." (*H.N. & Frances C. Berger Foundation v. City of Escondido* (2005) 127 Cal.App.4th 1, 9.) The advantage of the MNOI approach over other methods of determining fair rent was further explained in *Oceanside Mobilehome Park Owners' Assn. v. City of Oceanside*, where the court stated: "'Use of a return on value standard would thoroughly undermine rent control, since the use of uncontrolled income potential to determine value would result in the same rents as . . . would be charged in the absence of regulation. Value (and hence rents) would increase in a never-ending spiral.'" (*Oceanside Mobilehome Park Owners' Assn. v. City of Oceanside, supra*, 157 Cal.App.3d at pp. 899-900, quoting *Cotati Alliance for Better Housing v. City of Cotati, supra*, 148 Cal.App.3d at p. 287.) A return on investment standard may also be problematic to administer, because an owner's equity can be greatly affected by individual differences in methods and costs of financing, and because owners who inherit rental property or receive it through a gift have no cash investment against which to measure their return. (*Cotati Alliance for Better Housing v. City of Cotati, supra*, at p. 289.) Use of the MNOI formula ""avoids the necessity of having to undertake the administratively difficult (if not impossible) task of calculating equity and/or fair market value.""" (*Oceanside Mobilehome Park Owners' Assn. v. City of Oceanside, supra*, 157 Cal.App.3d at p. 903.) Instead, it "permits park owners to obtain a just and reasonable return under general marketing conditions in any given year" and "reflect[s] the tenant's interest by giving the park owner an incentive to incur all reasonable expenses for maintenance and services." (*Id.* at pp. 902-903.)

Appellant does not dispute that the MNOI approach has been upheld by every court to have considered it. Nor does it dispute that the Supreme Court has

upheld an agency's use of any fairly constructed formula. Appellant insists, however, that whatever formula is used, the owner must be permitted to pass its costs on to renters, without regard to the method of financing or the amount of the resulting rent increase. It cites *Westwinds Mobile Home Park v. Mobilehome Park Rental Review Bd*. (1994) 30 Cal.App.4th 84 (*Westwinds*) for the proposition that the existence of annual losses after all expenses, including debt service, are taken into account constitutes proof that the return is unfair. No such holding can be found in that case. The $4 rent increase approved there using an historical cost approach had resulted in a 2.78 percent return to the owner, representing the ratio between the purchase price and net operating income, without considering the cost of debt service. (*Id*. at pp. 91-92.) But "absolutely no evidence" was presented that comparable investments produced returns of 2.78 percent. The court held that without such evidence, the 2.78 percent return could not be presumed to be fair. (*Id*. at p. 92.) The court alluded to debt service, noting that the owner was losing approximately $10,000 per year after paying interest on its purchase loan; but far from concluding that this was definitive proof that rents were too low, the court explained that it had "rejected the notion that permissible rental rates . . . can vary depending solely on the fortuity of how the acquisition was financed." (*Id*. at pp. 91, 93-94.)[32]

---

[32] In support of this proposition, the court cited its decision in *Palomar Mobilehome Park Assn. v. Mobile Home Rent Review Com*., where the agency had compared net operating income to the owner's historical cost less depreciation to determine an appropriate rate of return on the owner's two parks. The owner complained that this formula failed to take into account interest expenses on the debt incurred to purchase its parks. (*Palomar Mobilehome Park Assn. v. Mobile Home Rent Review Com., supra,* 16 Cal.App.4th at p. 488.) The court explained that consideration of debt service would result in unfair variance in rents depending on the owner's individual financing arrangements: "Assume two identical parks both purchased at the same time for $1 million each. Park A is purchased for cash; Park B is heavily financed. . . . [C]alculating
*(Fn. continued on next page.)*

Apart from the inequities that would result from permitting a party who financed its purchase of rent-controlled property to obtain higher rents than a party who paid all cash, there are additional reasons for disregarding debt service. As explained by Dr. Baar, debt service arrangements could easily be manipulated for the purpose of obtaining larger rent increases, by applying for an increase based on servicing a high interest loan and then refinancing at a lower interest rate or paying off the loan after the increase was granted. Alternatively, an owner might periodically tap the equity in a valuable piece of rental property, thus increasing the debt load. In any event, we discern no rational basis for tying rents to the vagaries of individual owners' financing arrangements.

Appellant claims that the City did not properly perform a fair rent analysis, and that "unrebutted evidence" established that the rent increase permitted by the Board did not result in a fair rate of return, even if debt service is disregarded. Appellant refers specifically to the testimony and reports of its expert John Neet who purportedly "analyzed rates of return on directly comparable investments -- other mobilehome parks -- and determined that the proper rate[] of return [is] 9.0% for a return on [purchase price/historical cost] analysis . . . ." Neet's analysis was contradicted by Detling's appraisal, as explained by the reports and testimony of Brabant. In the appraisal, Detling compared the sales prices and net operating income of six similar mobilehome parks to determine those parks' capitalization

---

return based on total historic cost and treating interest payments as typical business expenses would mean that Park A would show a considerably higher operating income than Park B . . . [and] the owners of Park B would be entitled to charge higher rents than the owners of Park A. We see no reason why this should be the case." (*Ibid*.) The decisions in *Westwinds* and *Palomar* predated the widespread adoption of the MNOI approach by cities and rent control agencies. Their holdings are nonetheless pertinent to the present case because they establish that a legally sufficient rent increase formula need not take debt service into account.

rates and found that capitalization rates from comparable parks varied from 3.9 percent to 6.3 percent. Detling further calculated that based on the $23 million purchase price and the Park's 2005 net operating income of $1.1 million, the Park had a capitalization rate of 4.75 percent at the time of the sale.[33] According to Brabant, Detling's analysis of comparable sales established that 4.75 percent was an acceptable rate of return for an investment in a mobilehome park. Brabant further explained that mobilehome parks were a low risk investment justifying a relatively low return due to the likelihood that the spaces would be rented at or near 100 percent capacity. On this evidence, the Board could reasonably conclude that maintaining the Park's net operating income would result in a fair return to appellant. At the time of the Year 1 rent increase, the staff calculated that the Park's net operating income had been reduced to $944,029 due to a legitimate increase in operating expenses. By increasing rental income by $177,675 per year, the Board returned the operation to the same financial footing it was on at the time of the purchase.

In any event, it was appellant's burden to establish to the Board's satisfaction that the rent increase of $36.74 proposed by Dr. Baar and the staff using the MNOI analysis would not provide a fair return (see Guidelines, §IV(A)). It failed to do so. As explained by Brabant's reports and testimony, Detling's appraisal established that a rent increase of $36.74 would maintain the Park's MNOI and capitalization rate within the range acceptable to the average investor. Detling's figures for average capitalization rates were supported by the sales of at least six comparable mobilehome parks. Neet's analysis represented an attempt to

---

[33] As capitalization rate measures the ratio of the purchase price to net operating income, this essentially meant that had appellant purchased the Park with cash and incurred no substantial increase in operating expenses, it would have obtained that 4.75 percent return annually on its $23 million investment.

manufacture a required rate of return using questionable assumptions and unsupported numbers. He began with an investor survey which indicated higher returns (8.52 to 12.44 percent) were necessary because it included a component for anticipated appreciation and was not limited to rent controlled parks. (See *Los Altos El Granada Investors v. City of Capitola* (2006) 139 Cal.App.4th 629, 640 [comparing rates of return that include appreciation with capitalization rates was "like comparing apples and oranges"].) Neet then opined that the acceptable rate of return for the Park should be toward the high end of that spectrum based on his curious conclusion that a rent controlled mobilehome park should be expected to return *more* than a non-rent controlled one. As our Supreme Court has said, the *opposite* should be expected to occur. (*Galland*, *supra*, 24 Cal.4th at pp. 1026-1027.) Then, rather than deduct the Park's historical appreciation rate (which had been quite high) or an appreciation rate based on appellant's proposed use of the property, he estimated a modest 1.5 percent appreciation rate going forward.[34] As Brabant explained, the end result of Neet's calculations was a figure for a rate of return that represented a ratio between the Park's net operating income and its purchase price -- in other words, its capitalization rate. But the Board had no reason to rely on Neet's contorted analysis when it had before it evidence, based on actual sales, showing that a capitalization rate of 4.75 percent was acceptable to investors and about average for comparable mobilehome parks. The Board approved an increase in rent which kept the Park's ratio of net operating income to purchase price at about the same level as at the time of purchase, providing a return

---

[34] Even at that rate, the Park would appreciate at the rate of $345,750 per year. We note that when calculating the rent increase needed for a "fair" return in support of appellant's Year 2 applications, Neet estimated the value of appellant's investment in the Park at $24,800,000, an increase of $1,750,000, based on a 7.5725 percent rate of inflation.

39

similar to that of other comparable parks. The Neet analysis provides no basis to overturn the Board's determination.

The parties debate whether appellant overpaid for the Park. Appellant relies on evidence that the purchase was an arms-length transaction, and that other potential buyers made similar offers. The City relies on the fact that the amount paid was in excess of the amount that could be justified by the Park's rental income if the purchase required assumption of an 80 percent loan at 7 percent interest. We do not consider this issue determinative. The MNOI approach used by the Board is an approved methodology that does not take land acquisition cost, including debt service, into account. By maintaining net operating income, adjusted upward for inflation, from year to year, this approach allows for appreciation and permits the purchaser to determine whether the property is worth the selling price based on the purchaser's individual cash flow requirements and its future plans for the property. Although the Board did not consider appellant's long-term plans when it addressed the rent increase applications, we note that the City has approved appellant's application to convert the Park to condominium-style ownership, allowing appellant to sell the plots individually to the mobilehome owners. Accordingly, appellant cannot reasonably be heard to complain that it has been forced by the Board's decision to operate a losing investment.[35]

---

[35] (See *Palomar Mobilehome Park Assn. v. Mobile Home Rent Review Com.*, *supra*, 16 Cal.App.4th at p. 489 ["'Return' on a piece of investment property should include both short-term return, in the form of rents, and long-term return, which is reflected by the appreciated value of the property realizable only when the property is sold."].) Using the staff's numbers for gross income and expenses -- which appellant does not dispute for purposes of this appeal -- the total cash deficit including debt service was just over $300,000 after the property tax increase was included. The $36.74 rent increase permitted by the Board increased the Park's income by $177,675 per year, leaving a small deficit, acknowledged by appellant to be $134,297. A deficit of $134,297 would be more than compensated for by even a modest amount of appreciation.

## 2. *Use of 2005 for Base Year*

Appellant contends the use of 2005 as the base year for the MNOI analysis was inappropriate, and that a proper MNOI analysis must always begin with a year prior to the institution of rent control. Alternatively, it contends that the City failed to permit appellant, as a new property owner, to rebut the presumption that the previous owner was earning a fair return. Finally, it contends that the evidence presented "more than rebutted that presumption." For the reasons discussed, we find no merit to these contentions.

The Guidelines provide an "assumption" that the profit earned by the park owner when the Ordinance was adopted provided a fair return. (Guidelines, §§I(C); IV(A).) The original park owner had the right to rebut the assumption and apply for an increase on the ground that existing rents did not allow the owner to earn a fair return. (*Id*., §I(E).) Thereafter, the Board was to evaluate rent increase applications on the basis of changes in income, expenses, CPI, etc. that occurred *after the date of the last increase approved by the Board*. (*Ibid.*) The Guidelines expressly prohibit the Board from reconsidering its past decisions on rent adjustments "after they have been embodied in a formal written resolution setting forth the findings of the Board." (*Ibid.*) In accordance with the Guidelines, the Board here assumed that the Park's net operating income at the time of the last rent increase obtained by the prior owner allowed a fair return and used 2005 -- the year before appellant purchased the Park -- as the base year for its MNOI calculation. The Board concluded that to do otherwise would essentially constitute reconsideration of its past decisions, which had become final through the passage of time or court challenges.

As appellant acknowledges, "[c]ourts have approved the selection of base years that significantly postdate the enactment of rent control." (*Los Altos El Granada Investors v. City of Capitola*, *supra,* 139 Cal.App.4th at p. 655; see, e.g.,

41

*MHC Operating Limited Partnership v. City of San Jose, supra,* 106 Cal.App.4th at p. 223, fn. 4; *Rainbow Disposal Co. v. Escondido Mobilehome Rent Review Bd.*, *supra,* 64 Cal.App.4th at p. 1170.) It is within a city's prerogative and legislative authority "to determine what rent control scheme it will adopt" and "to decide what base year to employ in its rent control ordinance." (*MHC Operating Limited Partnership v. City of San Jose*, *supra*, at p. 223 & fn. 4.)

Appellant cites *Palomar Mobilehome Park Assn. v. Mobile Home Rent Review Com.*, *supra*, 16 Cal.App.4th 481, contending the court there disallowed use of an MNOI analysis because it did not begin with a pre-rent control base year. Appellant's interpretation of *Palomar* is incorrect. The ordinance at issue did not adopt an MNOI approach. (*Id*. at p. 485.) However, in evaluating whether the rental income received by the owner met the ordinance's "'fair return on investment'" standard, the city attempted to rely on a calculation showing that the owner's NOI had not decreased. (*Id*. at pp. 486, 488.) The court held that because the ordinance did not establish a pre-rent control base year or provide procedures for the owner to contest whether it had received a fair return in the applicable base year, the city could not justify its decision on that basis. (*Id*. at p. 486.) Here, the Ordinance and Guidelines expressly permitted the former owner of the Park to present evidence that the pre-rent control rents did not allow it to earn a fair return. Accordingly, the MNOI analysis undertaken by the Board did not violate any principle set forth in *Palomar*.

Appellant further contends that use of an MNOI analysis is not appropriate unless the current owner is afforded the opportunity to challenge whether the previous owner's net operating income represented a fair return, and that it received no such opportunity here. The Guidelines specifically state that "each park owner has the right to apply for an increase on the ground that existing rents do not allow the park owner to earn a fair return," directing applicants to the

42

procedures for submitting a supplemental fair return application. (Guidelines, §I(F).) In discussing the fair return application procedures, the Guidelines reiterate that the Ordinance is based on the assumption that the rents in effect before the adoption of the Ordinance provided a fair return, and that the park owners attempted to rebut that presumption when the first applications for rent increases were submitted. However, the Guidelines further provide that the current owner "may file [a fair rent] application based on the claim that a rent increase is necessary because the park cannot earn a fair return without an increase greater than that permitted by application of the factors in the Ordinance . . . ." (*Id*., ¶IV.A.) In connection with this application the applicant may submit any "evidence [it] consider[s] relevant." (*Id*., ¶IV.A.4.) Appellant submitted a supplemental fair rent application, and nothing in the record indicates it was restricted in its ability to present evidence, including evidence that the former owner was not receiving a fair return.

With respect to its contention that the evidence undisputedly established that the 2005 net operating income was insufficient to provide the former owner a fair return, appellant points to evidence indicating that rents grew by 9 percent over a period when the inflation rate was 32.5 percent and that the former owner had failed to adequately maintain the property. There is no legal authority for the proposition that rent growth must match the rate of inflation to be considered fair. With respect to the prior owner's alleged maintenance shortcomings, appellant's increased maintenance expenses were accounted for in the MNOI analysis undertaken by the Board, and the cost of its capital improvements was the subject of a separate rent increase that permitted appellant to recover those costs. (See *Oceanside Mobilehome Park Owners' Assn. v. City of Oceanside*, *supra*, 157 Cal.App.3d at pp. 903 & 905 [MNOI approach "give[s] the park owner an incentive to incur all reasonable expenses for maintenance and services" because

43

park owners receive, through increases in NOI, a "'pass through' of the increase in operating costs"].)

Moreover, appellant overlooks the overwhelming evidence that far from being disadvantaged by the imposition of rent control, the prior owner obtained a rate of return any investor would envy. It is undisputed that in the year prior to the sale to appellant, the former owner earned over $1.1 million in net operating income and had a gross profit of over $700,000.[36] Nothing in the record indicates this was atypical or that returns were substantially less in the preceding years. In addition, based on the final sales price, the property was appreciating at an average rate of $1.7 million per year, all of which inured to the former owner's financial benefit when the property was sold. By any measure, this was a very healthy return on the $3.5 million initial investment. On the record before it, the Board was not required to look all the way back to 1978 to find a time when a Park owner was receiving a fair return. The Board's determination that 2005 was an appropriate year on which to base its MNOI analysis was reasonable.

### 3. *Indexing CPI at 75 Percent*

Amicus Pacific Legal Foundation contends that once a base year is selected for the MNOI analysis and net operating income for that year calculated, it must be adjusted upward for inflation by 100 percent of the CPI.[37] The Supreme Court has

---

[36] We note that these were the figures that according to Detling, justified the purchase price appellant paid for the Park. In *Los Altos El Granada Investors v. City of Capitola*, the court approved the use of 1987 as the base year in part because "that was the year Parkowner purchased [the park] and presumably adjusted its purchase price to provide it with a fair return based on the rent levels in effect at the time." (*Los Altos El Granada Investors v. City of Capitola*, *supra*, 139 Cal.App.4th at p. 655.)

[37] Appellant argues that the Board's decision to utilize 75 percent of CPI was arbitrary.

44

made clear that a valid rent control system "must generally permit profits to be adjusted over time for inflation so that the real value of that profit does not shrink toward the vanishing point." (*Galland*, *supra*, 24 Cal.4th at p. 1026.) However, the contention that net operating profits must be adjusted by 100 percent of inflation has been repeatedly rejected. (See, e.g., *Stardust Mobile Estates, LLC v. City of San Buenaventura* (2007) 147 Cal.App.4th 1170, 1182 [upholding adjustment in the amount of 50 percent of CPI]; *Oceanside Mobilehome Park Owners' Assn. v City of Oceanside, supra,* 157 Cal.App.3d at p. 902 [rent adjusted to ensure net operating income increased by percentage equal to lesser of housing component of CPI or 40 percent].) In *H.N. & Frances C. Berger Foundation v. City of Escondido*, the court explained why 100 percent indexing was not required for a rent controlled mobilehome park to achieve a fair return: "A mobilehome park's operating expenses do not necessarily increase from year to year at the rate of inflation, and . . . a 'general increase at 100% of CPI . . . would be too much if expenses have increased at a lower rate.'" (*H.N. & Frances C. Berger Foundation v. City of Escondido*, *supra*, 127 Cal.App.4th at p. 14.) Moreover, "the use of indexing ratios may satisfy the fair return criterion because park owners typically derive a return on their investment not only from income the park produces, but also from an increase in the property's value or equity over time." (*Ibid*.; accord, *Los Altos El Granada Investors v. City of Capitola*, *supra*, 139 Cal.App.4th at p. 640 [explaining that "one reason for indexing NOI at less than 100 percent of the change in the CPI" is that "real estate is often a leveraged investment" in which "[t]he investor invests a small amount of cash, but gets appreciation on 100 percent of the value"].) Here, the Board took account of appellant's increased operating expenses and reasonably concluded a rent increase indexed at 75 percent of CPI would maintain net operating profits at the level necessary to provide a fair return.

45

C. *2008 Rent Increase Applications (Year 2)*

Appellant contends that the judgment in the writ proceeding involving the 2008 rent increase applications should be reversed for the same reasons expressed in its argument and analysis pertaining to the 2007 rent increase applications. We have concluded that the substantial evidence supported the Board's conclusion that the rent increases allowed in connection with the 2007 applications were fair and non-confiscatory. We reach the same conclusion with respect to the rent increases allowed for the following year and likewise find no basis for reversing the trial court's order denying the petition. In brief, the staff's analysis of the 2008 rent increase applications showed net income of $2,053,692 for the fiscal year ending March 31, 2008, and operating expenses of $1,155,667, resulting in net operating income of $898,025.[38] The approved rent increase of $25.02 per space per month increased net operating income by $120,996 to $1,019,021, maintaining approximately the same net operating income and capitalization rate as when the property was purchased.

D. *Grant of Motion to Strike England Reservation*

Appellant contends the trial court erred in striking its reservation of federal claims under *England*, *supra*, 375 U.S. 411. We agree.

In *England*, the Supreme Court held that a litigant who has properly invoked the jurisdiction of a federal court cannot be compelled to accept a state court's determination of his or her federal claims. (*England, supra,* 375 U.S. at p. 415.) A party who must litigate certain issues in state court prior to pursuing related federal claims may "forestall any conclusion that he has elected not to return to the District

---

[38]     We note that the stated income would not have included any part of the prior rent increase, which was not approved until later in 2008.

Court . . . by making on the state record [a] 'reservation to the disposition of the entire case by the state courts' . . . .  That is, he may inform the state courts . . . that he intends, should the state courts hold against him on the question of state law, to return to the District Court for disposition of his federal contentions." (*Id*. at p. 421.)

Under California law, a party may move to strike "irrelevant, false, or improper matter inserted in any pleading." (Civ. Proc. Code, § 436, subd. (a).)  In striking the *England* reservation, the trial court acted in accordance with the decision in *Los Altos El Granada Investor v. City of Capitola*, *supra*, 139 Cal.App.4th 629 (*Los Altos I*).  There, the court upheld a similar order, finding that *England* endorsed inserting a reservation in a state court pleading only when the litigant had filed in federal court and the district court had abstained under *Pullman*, *supra*, 312 U.S. 496, that is, when there were "unsettled questions of state law which, when resolved, would obviate the need for a decision on the federal constitutional questions presented . . . ." (*Los Altos I, supra,* at p. 652.)  In the case before the *Los Altos I* court, the district court had abstained under *Younger v. Harris* (1971) 401 U.S. 37 (*Younger*), which requires abstention "if the state proceedings are (1) ongoing, (2) implicate important state interests, and (3) provide the plaintiff an adequate opportunity to litigate federal claims.  [Citation.]'" (*Los Altos I*, *supra*, at p. 653, quoting *The San Remo Hotel v. City and County of San Francisco* (9th Cir. 1998) 145 F.3d 1095, 1103.)  The *Los Altos I* court concluded that "'*England*, and its reservations, are not relevant . . . in the *Younger* context, where the purpose of abstention is not clarification of state law, but reluctance to interfere with an ongoing state judicial proceeding.'" (*Los Altos I*, *supra*, at p. 654, quoting *Duty Free Shop v. Administracion De Terrenos* (1st Cir. 1989) 889 F.2d 1181, 1183.)

47

That portion of the decision in *Los Altos I* has been undermined by a subsequent federal decision, *Los Altos El Granada Investors v. City of Capitola* (9th Cir. 2009) 583 F.3d 674 (*Los Altos II*).  *Los Altos II*, a continuation of the *Los Altos I* litigation in federal court, clarified that the plaintiff had submitted two *England* reservations.  The first was included in a state court pleading after a district court had dismissed the plaintiff's takings claim as unripe under *Williamson*, *supra*, 473 U.S. 172; the second occurred after a judgment upholding the agency's fair rent calculation was entered, at which point the plaintiff returned to federal court and the district court abstained under *Younger*, *supra*, 401 U.S. 37, staying the federal case until the state appeal was resolved.  The Ninth Circuit held that a reservation of claims under *England* was appropriate in both situations:  (1) where the federal case is dismissed for lack of ripeness under *Williamson*, *supra*, 473 U.S. 172, and there is no federal case pending; and (2) where the district court abstains under *Younger* and does not dismiss, but stays the proceedings pending the final decision of the state courts.[39]  (583 F.3d at pp. 684-690.)

The Ninth Circuit further held that a state court's decision to strike an *England* reservation will have no impact on the plaintiff's ability to pursue a federal claim after the state court litigation is concluded:  "Even granting full faith and credit to the Superior Court's decision to delete [the plaintiff's] *England* reservation from its complaint, the Superior Court's action cannot have had any 'preclusive' effect on the claims [the plaintiff] can assert before a federal court,"

---

[39]    The Ninth Circuit had previously held that an *England* reservation was appropriate where the litigant filed in state court first, due to a clear procedural obstacle, such as an exhaustion requirement, or where the plaintiff realized that abstention was likely. (*United Parcel Service v. California Pub. Utilities* (9th Cir. 1996) 77 F.3d 1178, 1182-1185; *Tovar v. Billmeyer* (9th Cir. 1979) 609 F.2d 1291, 1293-1294.)

because "an explicit, on the record reservation is not required to preserve federal claims." (*Los Altos II, supra,* 583 F.3d at p. 687.)[40]

Appellant's federal takings claim based on the Board's 2008 determination of the 2007 rent increase applications was dismissed by the district court for lack of ripeness under *Williamson*. Having received a clear message from the district court, appellant did not file a claim in federal court following the next year's Board determination. When appellant thereafter filed the superior court actions, it included the *England* reservations in order to advise the court and respondents that it had no intention of resolving its federal constitutional claims in state court, but would resort to federal court for resolution of such claims when the matters were ripe. Although the Ninth Circuit has held that insertion of an *England* reservation in a state court pleading is not a strict prerequisite to preserving federal claims, we conclude that it is neither "irrelevant, false or improper" for purposes of a motion to strike. The presence of the *England* reservation clarifies in a manner helpful to both the court and the opposing party that a litigant wishes to limit the state court action to state issues. On the other hand, striking a reservation may lead to unnecessary confusion and duplication, as the litigant may feel compelled to raise

---

[40] The court based this assertion on the Supreme Court's statement in *England* that "'an explicit reservation is not indispensable; the litigant is in no event to be denied his right to return to the District Court unless it clearly appears that he voluntarily . . . and fully litigated his federal claims in the state courts.'" (*Los Altos II, supra,* 583 F.3d at p. 688, quoting *England*, *supra*, 375 U.S. at p. 421.) Indeed, in the Ninth Circuit's view, the state court's decision to strike the *England* reservation helped preserve the district court's jurisdiction to hear the federal claims because it "demonstrat[ed] that '[the plaintiff was] compelled by the state courts to litigate [its federal] claims there'" and that it had not "voluntarily litigated its federal claims in either the [local] Superior Court or the California Court of Appeal." (583 F.3d at p. 688; see *United Parcel Service v. California Pub. Utilities, supra,* 77 F.3d at p. 1184 ["A free and unreserved submission to the state court of all federal claims for complete and final resolution [bars] return to the federal court."].)

49

federal issues in the state action although he or she intends to litigate the matters in federal court.  Moreover, to allow a motion to strike to succeed in this situation would only lead to pointless law and motion practice, as a state court order striking the reservation cannot curb a federal court's jurisdiction for the reasons stated in *Los Altos II*.  Accordingly, we conclude that the better practice is to permit assertion of *England* reservations where the litigant's federal claims have been dismissed for lack of ripeness under *Williamson*, or where the litigant anticipates such dismissal and files first in state court.

## DISPOSITION

The orders striking the *England* reservations from the petitions for writ of administrative mandate are reversed.  In all other respects, the judgments are affirmed.  The City is awarded its costs on appeal.

**CERTIFIED FOR PUBLICATION**

MANELLA, J.

We concur:

WILLHITE, Acting P. J.

SUZUKAWA, J.

50